| 54 | 17 |
| 37a | 120 |
| 54 | 17 |
| 105 | 590 |
| 54 | 17 |
| 107 | 204 |
| 54 | 17 |
| 120 | 7 |
| 54 | 17 |
| 131 | 137 |
| 54 | 17 |
| 134 | 561 |
| 54 | 17 |
| 153 | 575 |
| 54 | 17 |
| 160 | 341 |
| 160 | 349 |
| 54 | 17 |
| 97a | 391 |

STATE OF MISSOURI, Respondent, vs. KATE CLARKE, Appellant.

1. *Social evil ordinance of St. Louis valid.—General law repealed by charter.*— The power given to the City Council of St. Louis, under the municipal charter of 1870, Art. III, § 1,(Sess. Acts 1870, 463-4) " by ordinance not inconsistent with any law of the State " * * " to regulate bawdy houses," operated as a repeal of the General Statute prohibiting them, in respect to the city of St. Louis. And a city ordinance licensing them is valid, under the charter, notwithstanding the general inhibition of the statute, and a license taken out in conformity with the ordinance will shield them from criminal proceedings by the State.

Such ordinance is not void as against public policy or good morals. The best indication of public policy is to be found in the action of the Legislature. And there is no warrant to suppose that the law had any other purpose than the promotion of morality and health to the citizens.

2. *Constitution—Law unconstitutional in part not wholly void.*—Unconstitutional provisions of a law do not render it void as to other and independent provisions.

PER VORIES J., DISSENTING, SHERWOOD J., CONCURRING.

3. *St. Louis, charter, granting authority to regulate brothels, not a repeal of general law.*—Section 19, Art. VIII, Ch. 42 of the Statutes of Missouri (W. S., 502), prohibiting bawdy houses, is not repealed by the Charter of the city of St. Louis of 1870, Art. III, § 1. (Sess. Acts 1870, 463-4.) The general law prohibiting and the special law regulating brothels are not inconsistent.

State v. Clarke.

*Appeal from St. Louis Court of Criminal Correction.*

*Lackland, Martin & Lackland,* for Appellant.

I. The Charter of the City of St. Louis gives the City Council power by ordinance, to "regulate or suppress" bawdy or disorderly houses, houses of ill fame or assignation.

It is evident, that the Legislature intended to give the City Council power to control bawdy houses. And this power includes the idea of permissive existence.

Under the power to "regulate commerce," Congress has full and entire control of the whole subject as a unit. The power not only includes properly the subject of commerce, but also all the necessary vehicles and appliances necessary to carry it on. (2 Sto. Const., 510, § 1061 ; Gibbons vs. Ogden, 9 Wheat., 1; Brown vs. Maryland, 12 Wheat., 419.)

It is true, that by the general law, the keeping of a bawdy house is prohibited, and the charter provision amounts to a repeal of the general State law, so far as the City of St. Louis is concerned. (State vs. Binder, 38 Mo., 450.)

In the case of Binder, the right of the city to exercise the power depended upon a condition of a majority vote of the legal voters. In the present case, if the power be contained in the word "regulate," the city is invested with the power without condition. With this exception, the cases appear to be the same in principle.

The case of the City of St. Louis vs. Laughlin, does not apply here. The question decided in that case was, whether the general clause giving power to said city to tax "all other business, trades, avocations or professions whatsoever" included lawyers.

In this grant of power, which we are considering, bawdy houses, assignation houses, and houses of ill fame, are expressly named.

*J. G. Lodge,* for Appellant.

I. The ordinance in question undoubtedly permits and authorizes bawdy houses to be kept in this city under certain restrictions.

The first question to be considered then, is, whether the city charter authorizes the City Council to pass such an ordinance as Ch. XIV. of the ordinances of the city of St. Louis, or so much of said ordinance as, under certain restrictions, permitted defendant to keep said house.

The term "to regulate" as used in this charter, in every place where it is found in this section, is of broad and uniform significance, and means nothing else than to prescribe the rule by which the subject to which it relates is governed.

And in the law generally it has this significance. Where the term is used in the Constitution of the United States, it has this meaning. Just such authority with reference to bawdy houses was never conferred by any previous charter.

It has been laid down as a rule of interpretation of statutes, since the days of Lord Coke, that in order to arrive at the meaning of the act under consideration, we must consider what the law was before the mischief, the remedy, and the true reason for it, which he says is the very lock and key to set open the windows of the statute. (1 Bish. C. L., 566.)

The first charter of St. Louis, where any authority was expressly given on this subject, was that of 1822, when St. Louis was yet called a town. And in that charter the only power given was "to restrain and prohibit." (R. O. 1866, p. 4, § 12.)

In 1835, the charter was revised and amended by the Legislature, and the same language was held. (R. O. 1866, p. 48, § 32.)

In the year 1839, a new act of incorporation was passed, in which the authority given, with reference to houses of prostitution, is to tax and prohibit. The exact words are: "To tax, restrain, prohibit and suppress tippling houses, dram-shops, gaming and gambling houses, and bawdy and other disorderly houses." (R. O. 1866, p. 56; § 1, sub-sec. 23.)

And again in 1841, upon the amendment of the charter, the same language was held as in the charter of 1839.

In 1843, an act passed the State Legislature and became a law, under which the only authority given to the city over bawdy houses was to suppress them. (R. O. 1866, p. 75,

(Art. 3, § 2, sub-sec. 22.) And the same is true of the re-vision and amendment of the charter in the years of 1851 and 1867. But in the year 1870, the present charter of the city of St. Louis was adopted, and in it the Legislature gives the city power " to regulate " or suppress bawdy-houses. This is a marked change.

Now if we apply our rule of interpretation, much light is let in as to the evident intent of the Legislature in making this change. From the time when St. Louis was a small town, (1843,) and until 1870, a uniform system of forcible repression only had been authorized ; but in 1870, when the city had ac-quired such importance and dimensions, and when all legisla-tion in regard to it was of such vital interest, a radical change concerning this whole subject was made, if we are to take lan-guage in its usual and legal sense.

The term " to regulate," as used in this charter with refer-ence to bawdy houses, means to prescribe the rule by which they are to be governed. Whenever this word is used in the charter, it has this meaning, and it cannot have·one meaning in all other parts of the charter (and it is a word of frequent occurrence), and a different meaning in this solitary instance, as applied to houses of ill-fame. The popular and usual mean-ing of the word is the same as above defined. Webster's de-finition is : " Regulate : to adjust by rule ; method or estab-lished mode ; to direct by rule or restriction ; to subject to government, principles or laws." " Regulation : a rule or or-der prescribed for management or government." Worcester's definition is substantially the same.

The term regulate has also received judicial notice. And the Supreme Court of the United States, in interpreting that clause of the national constitution, which says : " Congress shall have power to regulate commerce," &c., says, that the word regulate, as used in that connection, means to prescribe the rule, by which commerce is to be governed. (9 Wheat., 146 ; Sto. Com. Con., § 1061 ; Dwar. Stat., 274 and n.)

II. But it is said, that the general words, with which article 3 of the charter of St. Louis is headed, are to govern this

term, " to regulate," in a subsequent special clause of said article. The general words are as follows : "The Mayor and City Council of the City of St. Louis shall have power within the city, by ordinance not inconsistent with any law of the State," to pass ordinances, &c.

Now, this same general clause, which I have just read, was in the previous charter of St. Louis—that is of 1867. But this word " regulate," with reference to bawdy houses, was not in that charter. The only power therein given (in the charter of 1867) was to suppress.

The Legislature, in passing the city charter of 1870, must be presumed to have had these general words in mind, when they amended the charter by introducing the special clause, giving the City Council power to regulate, as well as to suppress, bawdy houses, &c.

If the Legislature did not intend to give the city the power over this subject, that it did over every other subject which it gave the city power to regulate, why did it not leave the law as it was ?

The city had power under the charter of 1867 to "suppress" bawdy houses. And can it be conceived, while we are seeking for the legislative intent of this matter, that the Legislature amended the charter of 1867, in this marked and emphatic manner, to still give the power only to suppress these houses, a power which the city had before?

III. The general words in one clause of a statute may be restrained by the particular words in a subsequent clause of the same statute, where a general intention is expressed, and the act also expresses a particular intention, incompatible with the general intention. The particular intention is to be considered in the nature of an exception. (Dwar. Stat., 110, 117, 160, 273 ; Sedg. Con. & Stat. L., 423, 61, 133 ; Rex vs. Archb. of Armagh, 8 Mod., 5 ; Churchill vs. Crease, 2 Moore & P., 415 ; 5 Bing., 180 ; Bishop Stat. Crimes, 126, and n. ; State vs. Binder, 38 Mo., 450 ; State vs. Macon Co. Court, 41 Mo., 453 ; 47 Mo., 146.)

This interpretation will give effect to this special clause of

the charter and reference to houses of ill-fame, and it cannot be denied, that it is a special clause, and that it is subsequent to the general words at the beginning of Article 3 of the charter.

And the said charter ordinance being irreconcilably inconsistent with, and repugnant to, the State law; and the charter, being a special act of the Legislature, and passed subsequently to the State law, we claim, repeals the State law by implication. (51 Mo., 420; Deters vs. Renick, 37 Mo., 597; 47 Mo., 29; Vastine vs. Probate Ct., 38 Mo., 529; 47 Mo., 146; State vs. Macon Co. Ct., 41 Mo., 453; St. Louis vs. Alexander, 23 Mo., 483; Tierney vs. Dodge, 9 Minn., 166; State vs. Binder, 38 Mo., 450; 1 Blackst., 89; State vs. Morristown, 33, N. J., 57; State vs. Branin, 3 Zabr., 484; State vs. Clarke, 1 Dutch., 54; State vs. Jersey City, 5 Dutch., 170; *In re* Goddard, 16 Pick., 504; Dill. Mun. Corp., § 54, and n.; Ang. & Ames' Corp., 333; Cooley's Con. Lim., (2nd Ed.,) 198; Comm. vs. Patch, 97 Mass., 221; St. Louis vs. Weber, 44 Mo., 547.)

And a city may pass ordinances inconsistent with the general law of the State, where the power to do so is clearly given in the special act of incorporation or charter. If the charter contravenes the general laws of the State, so may ordinances do the same to the extent authorized by the charter, and they will be valid. (Cooley's Con. Lim. 198, and n. 3; Dill. Mun. Corp., § 54 and n.; 1 Bish., C. L., § 58, and n. 3; State vs. Binder, 38 Mo., 450.)

IV. It cannot be objected to as of supposed immoral tendency, because that is a matter for the Legislature to consider. If a law is passed, and it contravenes no provision of the constitution, State or national, it cannot be overthrown, because in the opinion of a court it is of questionable morality. (Sedgw. on Stat. Con. L., 180 to 188, and cases cited; Cooley's Con. Lim., 169 and n.)

*M. W. Hogan*, for Respondent.

1. The ordinance, under which the defendant claims the right to carry on and maintain a bawdy-house in the city of

St. Louis, is no legal defense to this action; because such ordinance is against religion and good morals; because it contravenes the statute law of the State; and because it is against the spirit of the common law and constitutional law of the land. The city council had no right, power or authority, from the wording of the city charter, which merely says, " to regulate or suppress bawdy or disorderly houses, houses of ill-fame or assignation," to license such houses, and, for the payment of taxation, to protect them in the carrying on of their nefarious calling. The words " to regulate" give the council no such sweeping power. (City vs. Laughlin, 49 Mo., 559.) An ordinance to be effective must be in accordance with the statute and common law of the State, for it has been so repeatedly declared. (Sedg. Stat. and Const. law, 313.) But this ordinance would not only alter, but entirely do away with the common and statute law of the State at one "fell swoop."

II. The city council in the making of ordinances has no power to transcend the authority given it by the charter. (Sedg. Stat. and Const. Law, 467, 469; Halstead vs. The Mayor of the City of N. Y., 3 Com., 431.)

III. A license, as applied to the case at bar, is a contract between the city of St. Louis and the defendant, wherein it is agreed, that for the consideration of a certain sum of money to be paid to the city as taxes, that the city will authorize, license and protect defendant and all of her class, who take out such licenses and pay such taxes, in the carrying on of such bawdy-houses, or houses of ill-fame within the city. Such a contract cannot stand. For all contracts founded on considerations *contra boros mores* are void. (Sto. Cont., (2d Rev. Ed.) §§ 541, 542; 2 Kent's Com., 466; 2 Hill, 434.)

IV. But the offense, with which the defendant is charged, is a wrong in itself, and no human legislation can make it right. It always has been prohibited, and was held to be a misdemeanor by the common law of England, as being against Divine and moral law, and such doctrines of the com-

mon law for the prevention of this and kindred vices were brought over to this country by the early colonists; and so well established is the law for the prevention of keeping bawdy houses, the punishment for adultery, fornication and like offenses, that although not written in the constitution, I might say, that by common consent they have become part of the constitutional law of the land, for we find in almost every State of this Union similar laws to the one for the vioation of which the defendant stands charged.

*Henry Hitchcock,* for Respondent.

I. The ordinance of July 10, 1871, as a whole, is "repugnant to, and irreconcilable with, the general law of the State with reference to bawdy-houses."

The grant of legislative power to the city on this subject is contained in these words, and none other, in the city charter of March 4, 1870, viz: (Sess. Acts 1870, p. 463.)

Article III. Section 1. "The Mayor and City Council shall have power, within the city, by ordinance not inconsistent with any law of the State, first to levy, and collect taxes, &c., &c. * * * * * (Sess. Acts 1870, p. 464.) Tenth, to license, regulate, tax, or suppress ordinaries, hawkers, &c., &c., * * * * * and to suppress prize-fighting, &c., &c., * * * * * and to regulate or suppress bawdy or disorderly houses, houses of ill-fame or assignation."

But if the ordinance was inconsistent with, and repugnant to, the State law—as claimed by the defendant—then the ordinance was *ultra vires* and void. (Dill. Mun. Corp., §§ 55, 251, 300, 353, and many cases cited; also cases cited *infra,* from Mo. Reports.

II. The State law in question (1 W. S., 502, § 19; W. S., Chap. 42, "Crimes and Misdemeanors," Art. VIII, § 19,) was not repealed by implication, either by the tenth clause of § 1 of Art. III, of the Revised Charter of 1870, (Adjd. Sess. Acts 1870, p. 464, above quoted,) or by the enactment by the Mayor and City Council, under, and (as alleged) in pursuance of, this charter power, of the ordinance of July 10, 1871.

1. "Repeals by implication are not favored or allowed, un-

less the first act be so inconsistent, as not to stand with the subsequent act." (Glasgow vs. Lindell, 50 Mo., 79 ; State vs. Macon Co., 41 Mo., 459 ; St. Louis vs. Alexander, 23 *ib.*, 483 ; Sedg. Stat. Const. Law, 127 and cases cited ; Bowen vs. Lease, 5 Hill, (N. Y.,) 221 ; Brown vs. Co. Comrs., 21 Penn., St., 37 ; Williams vs. Potter, 2 Barb., S. C., 316 ; Comm. vs. Herrick, 6 Cush., 465 ; Pot. Dwar. Stat. ; City of St. Louis vs. Laughlin, 49 Mo., 559.)

Municipal corporations can exercise no powers not granted either expressly, or by necessary implication, in their charters ; and that any reasonable doubt, as to existence of an alleged power, must be solved against the corporation. (Ruggles vs. Collier, 43 Mo., 375 ; St. Louis vs. Clemens, *Id.*, 404 ; Hitchcock vs. St. Louis, 49. Mo., 488 ; City of St. Louis vs. Laughlin, 49 Mo., 559 ; Dill. Mun. Corp., §§ 55, 300, and many cases cited in notes.)

There is no such expressed or implied repugnance between the charter and the general law.

III. The appellant however, makes the following points in support of the alleged repeal by implication :

1. That the word "regulate" was first used in this connection in the Revised Charter of 1870, and in no previous charter of this city, whence it is argued, that the Legislature then determined upon, and thus expressed, a new and different policy with reference to this city's power over this subject.

2. That the ordinance in question, passed in July, 1871, amounted to a "contemporaneous construction" by the city of this new word "regulate," which, in considering the disputed right of the city to pass such ordinance, this court will take into account.

3. That the meaning of the word "regulate," as settled by courts and lexicographers, is sufficiently broad to sustain the alleged repeal by implication.

4. That the words, "not inconsistent with any law of this State," at the beginning of section 1, of Art. III. of the charter, express merely the general intention of the Legislature ; whereas, the words "to regulate or suppress" express a par-

ticular intention, which must prevail over the power; that therefore, the power to "regulate" (as defined by appellant) must be taken as an intended exception to the general prohibition to pass ordinances "inconsistent with any law of the State."

5. That when a charter provision is directly in conflict with, or clearly expresses an intention to repeal, a prior general law, it does repeal such law.

To which it is replied for respondent:

1. As to the 5th or last preceding proposition, it is correct as a legal proposition, but totally irrelevant here, because no such conflict or intention to repeal appears. That legal proposition applies only, where, either in terms or by unavoidable implication, it appears on the face of the two statutes, that both cannot stand. (See authorities cited *supra*.)

2. As to the 1st point, viz: the alleged change of policy on the part of the Legislature, deduced from comparison of the successive city charters, no such inference is possible. On examining those charters it appears, that out of 51 years in question, the corporation was, during 21 years, "to restrain or suppress," with the added (not the alternative) power, during the last four of these years, to "tax," but this during those 4 years only, in all; during the next 17 years, it could only "suppress;" and during the last 3 years, it could "regulate or suppress."

3. The word "regulate" means "to make rules for." But what kind of rules are authorized or intended by its use must be ascertained from the subject matter, the scope and objects of the statute, and the settled rules of construction of municipal charters. This word has not, in this connection, any such meaning as alleged by appellant. (Dill. Mun. Corp., § 292; Gibbons vs. Ogden, 9 Wheat., 196; Cincinnati vs. Bryson, 15 Ohio, 625; 2 Sto. Const., (Ed. 1858,) 3, § 1061; *Id.* (Cooley's Ed. 1873), 4, § 1061.)

The ordinance is, but the charter is not, repugnant to the State law.

4. As to what kind of rules the city may make under such

a grant of power, it is insisted : "Where the power to legislate upon a given subject is conferred upon a municipal corporation, but the mode of its exercise is not prescribed, then the ordinance passed in pursuance thereof must be a reasonable exercise of the power, or it will be pronounced invalid." (Dill. Mun. Corp. § 262, and cases cited.)

And since the charter provisions referred to (viz: 10th clause of § 1, of Art. 3, of Rev. Charter of March 4, 1870, Adj. Sess. Acts of 1870, p. 464,) are simply a grant of power to "regulate or suppress" such houses, with no specific provision as to the mode of exercising such power, it follows: that any ordinance based on this provision will be invalid unless it "is reasonable and lawful, consonant with the general powers and purposes of the corporation, and not inconsistent with the laws or policy of the State." (Dill. Mun. Corp., § 253 and cases cited ; St. Louis vs. Weber, 44 Mo., 550 ; Paris vs. Graham, 33 Mo., 96 ; St. Louis vs. Cafferata, 24 *Id.*, 97 ; St. Louis vs. Allen, 13 *Id.*, 414; St. Louis vs. Bentz, 11 *Id.*, 62 ; Baldwin vs. Green, 10 *Id.*, 410 ; Harrison vs. State, 9 *Id.*, 531 ; (the two cases last cited are directly in point on the case at bar,) Jefferson City vs. Courtmire, 9 *Id.*, 693 ; St. Louis vs. Smith, 2 *Id.*, 114 ; State vs. Plunkett, 3 Harrison, (N. J.,) 6 ; Austin vs. Murray, 16 Pick., 125 ; Merriam vs. Moody, 25 Iowa, 170 ; Minturn vs. Larue, 23 How., (U. S,) 436.    There is no conflict with this in the case of State vs. Binder, 38 Mo., 456.)

5. The construction put upon the word "regulate" by defendant, viz: that this word implied a grant of charter power superior to, and necessarily conflicting with, the general criminal law on the same subject, and that therefore, this ordinance operates to repeal that State law within the city limits, is unreasonable as leading to absurd conclusions.    For if this be so, then the word "regulate" confers exclusive jurisdiction on the city as against the State courts.    And not on this subject only, but on all subjects where a like power "to regulate" is given.    Whence it follows, that the charter of 1870 operated within the city limits to repeal all prior State laws against

gambling and betting, against riots and breaches of the peace, against vagrants, against nuisances, dangerous trades or factories, and all other things affecting the public health, and many other matters which the city has power to " regulate." This is a *reductio ad absurdum*, and is contrary to express rulings of this, and other courts. (Harrison vs. State of Mo., 9 Mo., 531; Baldwin vs. Green, 10 *Id.*, 410; State vs. Plunkett, 3 Harrison, (N. J.,) 6; Minturn vs. Larue, 23 How., (U. S.,) 436; St. Louis vs. Cafferata, 24 Mo., 97.)

6. In reply to the remaining point made for defendant, viz: that the special grant of power "to regulate," &c., is to be considered an exception to the " general intention" shown by the words " not inconsistent with any law of the State," it is insisted: that this suggestion is based upon a complete misapplication of the principle referred to.

The rule laid down by this court in The State vs. Macon County, 41 Mo., 459, is, that "a later statute, which is general and affirmative, does not abrogate a former which is particular, unless negative words are used, or unless the two words are irreconcilably inconsistent."

Here no question arises between a prior and later act, but it is sought to nullify a general clause at the beginning of the 1st section of Art. 3 of the charter, intended to limit and circumscribe every following grant of power in that section, by a subsequent special clause setting forth one of these grants.

The Legislature begins the enumeration of the grants of legislative power, by declaring as a condition precedent to the exercise of any of such by the city, that it shall not contravene the general law of the State; and it is asserted here, that this condition precedent is immediately afterwards set aside by the simple mention of a power which can exist only under that condition.

In fact, the case above referred to, and cited on this point by defendant, is directly against the position taken for her here.

Here the argument from this record might well close, for if the foregoing propositions are correct, the judgment below must be affirmed.

If, however, the court shall see proper to consider the validity of the ordinance itself as a whole, not only as to the use which this defendant has attempted to make of it, but as to the power of the city council to enact it, the following further considerations are submitted:

I. According to the undisputed rules of construction of municipal charters, and in view of the uniform course of criminal legislation in this State, the 10th clause of section 1, of Article III of the Revised Charter of 1872, cannot be interpreted to sustain this ordinance, nor can the Legislature have intended by that clause to empower the Mayor and City Council to enact said ordinance, taken as a whole; and further:

II. Even had the Legislature intended by that clause to grant to the city authorities the extraordinary powers deduced from that one word "regulate," and embodied in this ordinance, such grant would be void, as in derogation of the rights of the citizen, and beyond the constitutional powers of the Legislature itself.

This ordinance cannot be held valid under the clause referred to:

(a.) If thereby the city assumes to exercise powers not in said clause expressly granted or resulting therefrom by reasonable and necessary implication. (Dill. Munc. Corp., § 251; Id., § 55, and cases cited; Hitchcock vs. St. Louis, 49 Mo., 484.)

(b.) Or if the city assumes thereby to exercise powers which are oppressive, unfair or discriminating in their operation. (St. Louis vs. Weber, 44 Mo., 547; Coms., &c. vs. Gas Co., 12 Pa. St., 318; Dill. Munc. Corp., §§ 254, 256; Mayor vs. Winfield, 8 Hump. (Tenn.), 707; Chicago vs. Rumpff, 45 Ill., 90; Whyte vs. Mayor, &c., 2 Swan (Tenn.), 364; Mayor, &c. vs. Thorne, 7 Paige Ch., 261.)

(c.) Or powers which are in contravention of the general laws and legislative policy of the State, which are not repealed in terms or by necessary implication by the charter. (Dill. Munc. Corp., § 253; Ib., § 55, and cases cited.)

(d.) Or powers whose exercise conflicts with the funda-

mental rights of the citizen, especially those relating to personal liberty or the rights of personal security. (Dill. Munc. Corp., § 253 ; *Ib.*, § 55, and cases cited.)

2. It is plain, on inspection of this ordinance, that it is "an entire by-law," framed and enacted for a simple general purpose, each part or section having relation to all the rest and having a general influence over the others. If, therefore, any of its essential provisions are void, the entire ordinance is void. (Dill. Munc. Corp., § 354, and cases cited ; Warren vs. Mayor, 2 Gray, 84 ; Comm. vs. Hitchings, 5 Gray, 482.)

3. In considering whether this ordinance is valid, the court will be governed by the terms and provisions of the ordinance itself, and by those alone. And unless the powers conferred, and the directions given, are, on the face of the ordinance, clear, well-defined and conformable to the law of the land, it will be the duty of the court, especially where the gravest questions of personal rights and liberty are involved, to declare it void. (Fisher vs. McGier, 1 Gray, 1.)

4. It is insisted for the respondent, that the ordinance is liable to each and every of the fatal objections above suggested :

1. It contravenes the general criminal legislation of the State in *pari materia.* The assertion of this proposition is the actual key note of this defendant's appeal here. (Dill. Munc. Corp., 253.)

2. It also contravenes the settled doctrine of the common law and the established policy of the State on this head of criminal legislation. For the effect and scope of this ordinance, as a whole, is nothing else but to protect the trade of harlotry within the limits of the city, provided only, that those who practice and maintain that trade will comply with certain regulations, aimed exclusively at certain loathsome physical consequences of their crime, but utterly ignore that which is "the gist of the offense," to-wit : its injurious effect on public morals. (2 Bishop's Crim. Law, § 65 ; 1 *Ib.*, (Ed. of 1872, 5th Ed.) § 1083 ; Dill. Munc. Corp., §§ 55, 253 263, 300.)

3. It is oppressive, discriminating and unjust; and this in more than one way; for, it assumes to inflict upon property owners, in whose neighborhood permission to keep a brothel is given by the police commissioners, that which is a nuisance at common law, and maintaining which is penal by statute, this under color of the official sanction of the corporate authorities. It also assumes, as below more fully stated, to arm irresponsible officers with extraordinary and oppressive powers against persons who are assumed to belong to a certain class or to pursue a certain criminal occupation. (4 Blacks. Comm., 167; 1 Bish. Crim. Law (Ed. 1872), § 1083; White vs. Mayor, &c., 2 Swan, 364.)

4. By this ordinance the city assumes to impose a tax of large annual amount upon persons engaged, or alleged to be engaged, in a certain criminal occupation, as such, although no power to either license or tax such occupation is conferred in said 10th clause of section 1 of Article III of the charter in respect of said occupation; whereas, in said 10th clause, &c., express power to license and tax is conferred in respect of certain specified trades and occupations; such tax moreover, being levied not for the purpose of suppressing this occupation, but avowedly to provide the means of treating certain physical ailments to arise from its expected and permitted continuance. (Dill. Munc. Corp., §§ 605–6, 291; Cooley's Const. Lims., 201, 205; St. Louis vs. Boatmen's I. & T. Co., 47 Mo., 150; Dill. Munc. Corp., § 291, 295, 299, and cases cited in notes; Mayor, &c. vs. Beasley, 1 Hump. (Tenn.), 240.)

5. The foregoing objections show, that by this ordinance the city has attempted to usurp powers, which the Legislature did not intend to, nor has, conferred by the charter provision "to regulate," &c. But by said ordinance, the city also assumes to exercise powers which the Legislature itself has not constitutional power to confer, namely:

1. It assumes to appoint special officers with power, and whose duty it is declared to be, at their discretion, to enter dwelling houses and private apartments upon their own pri-

vate opinion as to the mode of life of the inmates, without warrant or other authority of law for such trespass, and without providing for any judicial ascertainment, or even any lawful charge or complaint as to the character or use of such houses, or for the conviction of any such inmate in respect of any unlawful act, which is in violation of the bill of rights. (Art. XXIII of Bill of Rights, 1 W. S., 37; Sec. 11 of Ordinance; Fisher vs. McGier, 1 Gray, 1; Ex parte Milligan, 4 Wall., 2.)

2. It further requires such officers, without reference to or providing for the consent of any such inmates, to make examination of her physical condition in respect of certain suspected diseases, the " explorations " required by said ordinance, being necessarily such as, if attempted without such consent, would constitute a criminal assault of the most odious and aggravated character. (Sec. 11 of Ordinance; 4 Blacks. Com., 177, 213; 1 Bish. Crim. Law (Ed. 1872), §§ 546, 548; Art. XXIII Bill of Rights, 1 W. S., 37.)

3. Said ordinance further authorizes such officer, on his own judgment, that if any such inmate is affected by a certain disease, " to order her removal or cause her arrest and commitment to the hospital," to remain there without bail or lawful opportunity of release, till declared cured; and the refusal to obey such order is declared a misdemeanor. This, on the plea of authority in the city officers to guard against contagious diseases, although the disease in question is not within the definition of a nuisance, nor within the lawful powers or remedies applicable to nuisances; nor is such disease contagious except by the voluntary criminal act of third persons; nor can the intent, either to communicate or receive such infection, be lawfully presumed from the mere existence of said disease in a given person. (1 Bish. Crim. Law (Ed. 1872), § 490; 4 Blacks. Com., 166; People vs. Albany, 11 Wend., 539; Sedg. Stat. and Con. Law, 465; 1 Russell Crimes, 107–8; Fisher vs. McGier, 1 Gray, 1.)

4. Said ordinance also undertakes to compel any person keeping a brothel, and thereby subject to a criminal prosecu-

tion under the State law, to furnish to the health and police commissioners, on their demand for same, full information as to such house and the unlawful use thereof; or, in other words, to give evidence against herself in a criminal matter, on penalty of a misdemeanor for refusing, which is a violation of the Bill of Rights. (Sec. 18 of Ordinance; Art. XVIII of Bill of Rights, 1 W. S., 36.)

NAPTON, Judge, delivered the opinion of the court.

This was an indictment under the general statutes against defendant for keeping a bawdy house. The defendant pleaded a license from the city authorities under an ordinance, Chap. 14, passed by the Mayor and Common Council, and it is conceded, that the license is in proper form and was authorized by the ordinance. The Court of Criminal Correction, however, held the defense to be unavailing, because the ordinance was not valid. And the only question in the case is, whether the city authorities had power under their charter to pass this ordinance. The language of the charter is, that the city shall have power to "regulate or suppress bawdy houses." It would seem that resting on these words alone, a doubt would hardly be entertained as to a grant of the power; but at the beginning of section 1, of article third, in which this grant is made, the Legislature use these words: "The Mayor and City Council shall have power within the city, by ordinance, not inconsistent with any law of the State, first to levy and collect taxes," etc., and then proceeds to a specific enumeration of the several powers granted, in all nearly twenty, and embracing a great variety of subjects. The ninth of these clauses is to "license, tax and regulate auctioneers," etc. The tenth is to "license, regulate, tax or suppress" ordinaries, etc., and "to suppress" prize-fighting, etc., and to regulate or suppress bawdy houses.

It is clear, that the Legislature understood the difference between regulation and suppression, and whilst they only conceded to the city the power to suppress prize-fighting, gambling houses, etc., they allowed the city to either suppress or regulate bawdy houses.

State v. Clarke.

Now, by the general law of the State, long before the passage of this charter, and since, bawdy houses are totally prohibited and declared nuisances, and their keepers are indictable, and on conviction heavily punished both by fine and imprisonment.

And so, in the various charters granted to the city of St. Louis previous to 1870, the authorities of the city had only power to suppress these houses. There was in the charter of 1839 and 1841 a power given to tax, restrain, prohibit, and suppress, but, from 1841 down to 1870, the power was simply to suppress.

The change in 1870 was a significant one, and undoubtedly meant a change in the policy of the Legislature—very easily accounted for from the fact, that St. Louis had become a large city with nearly half a million of inhabitants—and the Legislature then deemed it advisable to throw upon the authorities of the city the responsibility of deciding what legislation would best promote the morals and health of the city, and therefore virtually said to them : " You are more competent to decide this matter, which concerns you so nearly, than we are. We therefore authorize you to enforce the general laws of the State on this subject and suppress these houses, or to regulate them, as you may think best."

The meaning of the word " regulate " has been discussed in this case ; but it is a word which from its Latin origin needs no explanation. It certainly implies the continued existence of the subject matter to be regulated.

" To regulate commerce," are words found in our Federal Constitution, and which have received a judicial interpretation, and they certainly conceded, that the commerce, concerning which Congress was allowed to make regulations, was to be allowed under some rules. It did not mean to annihilate or suppress, or to prohibit under all and every circumstance. No regulations or rules are necessary concerning an evil absolutely prohibited.

The only difficulty in the case arises from the fact, that whilst the Legislature of the State have clearly and specifical-

ly entrusted to the municipal Legislature of St. Louis a power to regulate this subject, as they thought most expedient, they have in the same enactment declared, that such legislation must be consistent with the general laws of the State. It is , perfectly plain, that this general declaration and the specific grant of power are totally irreconcilable: For the State law had never allowed regulations of any kind concerning bawdy houses, but had absolutely prohibited them, and made them nuisances and obnoxious to prosecution by the law officers of the State.

The question then arises, whether this general prohibition, or this special permissive existence under regulation, must prevail, and we are clear that a particular specified intent on the part of the Legislature overrules a general intent incompatible with the specific one.

Many authorities might be cited on this general proposition, but the case of the State vs. Binder, 38 Mo., 451, is directly in point in this case.

In that case, the Legislature authorized the city of St. Louis to allow certain beer saloons to be kept open on Sunday, though it was expressly prohibited everywhere else, and the court regarded this as a special exemption from the general law, and, so far as the city was concerned, necessarily a repeal of the general law.

There is no doubt, that the city authorities of St. Louis have no power except such as has been confided to them by the Legislature. No authorities are needed to establish this proposition, as this court has repeatedly recognized the doctrine. There is just as little doubt that, looking at the previous legislation concerning this subject in all the charters of the city, and considering the emphatic change made in 1870, and the subsequent action of the city authorities on that change, and the subsequent silence of the State Legislature on the subject, there was a deliberate intention on the part of the Legislature to leave this subject to the control of the people of St. Louis and their legitimate representatives in the Council.

It is said, that this ordinance is in subversion of the common law—contrary to the general law of the State—against public policy—and of immoral tendency; and that it contains provisions which infringe on the constitutional rights of citizens.

The Legislature have a right to change the common law—it has a right to allow the legislative authorities of St. Louis to regulate the subject now under consideration differently from what it is in the other portions of the State. It is a naked assumption to say, that any matter allowed by the Legislature is against public policy. The best indication of public policy is to be found in the enactments of our Legislature. To say that such a law is of immoral tendency is disrespectful to the Legislature, who no doubt designed to promote morality, and it is altogether unwarranted to suppose that the object of the law or the ordinance is for any purpose but to promote the morals and health of the citizens. Whether the ordinance in question is calculated to promote the object, is a question with which the courts have no concern. With the expediency, or propriety, or wisdom, of a legislative enactment, we have nothing to do. If a constitutional right is infringed, the courts are open to afford redress. We have no opinion, and therefore express none, about the expediency of this ordinance. Arguments on that point should be addressed to the State or city—Legislature. It would be a novel exercise of judicial power to pass on the expediency of legislative enactments—a matter outside of the province of courts of justice. The only question we have to decide is, whether the power existed to make the law, and we think that the Legislature granted this power.

If there are provisions in this ordinance, Chap. 14, which infringe on the rights of citizens, male or female, protected by the constitution and laws of the State, and such provisions are attempted to be enforced, the remedy is obvious. But even according to the case referred to in 1 Gray, it is not pretended that unconstitutional provisions in a law make it totally void. On the contrary, it is well settled, that they do

not, and that a law may well stand, so far as it is constitutional, although it has in it certain provisions which are not valid. And in this case the only question was, whether the defendant's license under the ordinance was a protection. No question, concerning the medical examination provided for in certain sections of the ordinance, arose.

No complaint on this subject was made by any one affected by the provisions said to be oppressive and in opposition to our bill of rights.

It was in fact conceded, that various provisions of the ordinance were entirely unexceptional so far as the State constitution was concerned, and it was only insisted, that the general intent and scope of the ordinance was to promote immorality. Of this we are not authorized to judge. The legislative authorities of St. Louis are more competent and better qualified to decide this question than this or any other court. We doubt not, that their intention was to promote the public morals. Whether the ordinance in question was the best mode of doing this, was a matter they were authorized to decide. This court has no power to revise their decision on this question—it was a legislative, not a judicial question.

Judgment reversed. Judges Adams and Wagner concur.

Dissenting opinion by Judge VORIES.

This was a prosecution against the defendant under the nineteenth section of the general statutes, page 818, for setting up and keeping a bawdy-house or brothel. This section provides, that "Every person who shall set up or keep a common gaming house, or a bawdy-house or brothel, shall on conviction, be adjudged guilty of a misdemeanor and punished by a fine not exceeding $1,000."

It is not pretended by the defendant, that she is not guilty, as charged, of a violation of this statute, provided said statute is still in force within the city limits of the city of St. Louis; but it is insisted, that this section of the statute has been repealed, so far as the inhabitants of the city of St. Louis are concerned, by a subsequent act passed by the General Assembly of the State of Missouri, entitled an act to revise the

charter of the city of St. Louis, and to extend the limits
thereof. This last act was approved March 4, 1870.

The first, and, I think, the main question necessary to be
considered in this case is: Did this last mentioned statute
repeal the section of the General Statutes under which the
prosecution in this case was instituted? In answering this
question, if we refer to the elementary writers and adjudged
cases on the subject, we will find that certain and well-de-
fined rules have been laid down for our government in such
cases. It is not pretended in this case, that the law under
which the prosecution was instituted was repealed by any
repealing clause in the last named act, or in any subsequent
act of the Legislature; but it is admitted, that if it is repeal-
ed, it was repealed by necessary implication.

In order to the repeal of a statute by implication the rule
is, that the implication must be absolutely necessary, in order
that the subsequent statute shall have any effect at all. If
both acts can stand, and any effect be given to the subsequent
act, which is not inconsistent with the former act, the former
act is not repealed. Sedgwick in his treatise on Stat. and
Const. Law, 127, uses this language: "It has been said that
laws are presumed to be passed with deliberation, and with
full knowledge of all existing ones on the same subject; and
it is, therefore, but reasonable to conclude that the Legisla-
ture, in passing a statute, did not intend to interfere with or
abrogate any prior law relating to the same matter, unless
the repugnancy between the two is irreconcilable; and hence
a repeal by implication is not favored; on the contrary, courts
are bound to uphold the prior law, if the two acts may well
subsist together." In our own court this rule has been re-
cognized and followed in several cases. (Pacific Railroad
Company vs. Cass county, 53 Mo., 17, and cases there cited;
see also, Dwarris on Statutes, 532, 533, and authorities
cited.)

Keeping these rules in view, let us now examine the law
of 1870 to revise the charter of the city of St. Louis. By
the first section of the third article of said act, which confers

legislative powers on the Mayor and City Council of said city, power is conferred to pass ordinances on a great variety of subjects; among other provisions, are the following: " The Mayor and City Council shall have power within the city, by ordinance, not inconsistent with any law of the State, first, to levy and collect taxes for general or special purposes on real and personal property and licenses," and then, after conferring a number of other specified powers, the act proceeds: "Tenth, to license, regulate, tax or suppress ordinaries, hawkers, peddlers, brokers, pawnbrokers, money changers, intelligence offices, public masquerade balls, street exhibitions, sparring exhibitions, dance-houses, fortune-tellers, pistol galleries, lottery ticket dealers, corn doctors, lock, private and venereal hospitals, museums and menageries, equestrian performances, horoscopic views, lung-testers, muscle developers, magnifying glasses, billiard tables or any other tables or instruments used for gaming, theatrical and other exhibitions, shows and amusements, tippling houses, dramshops, gift enterprises, and to suppress prize-fighting, coon fights, dog fights, chicken cock fights, gaming or gambling houses, and to regulate or suppress bawdy or disorderly houses, houses of ill-fame or assignation."

We are told, that the language in the last clause of the part of the statute here copied is wholly inconsistent with the law under which the defendant is prosecuted, and necessarily repeals the same. · That the language, " to regulate or suppress bawdy or disorderly houses," gives the city the power either to suppress or to regulate, as may be thought best, and that to regulate presupposes a continued and permissive existence of the thing regulated. I admit that the word regulate, as used in the law under consideration, presupposes the existence of the thing regulated, but I deny that it presupposes that such existence is either permissive or legal.

By the charter of the city of St. Louis of 1839, the language used on the same subject was, that the city should have power "to tax, restrain, prohibit and suppress bawdy-houses," etc. In that law the authority to tax certainly presupposed

the existence of the thing to be taxed; but I suppose that no one will contend, that a legal existence was implied by the authority to the city to tax; and that therefore the law of the State inflicting penalties on such persons was by implication repealed. I do not think that such a construction in either of the cases would be just to the Legislature. I suppose that the Legislature thought, as was argued by the learned counsel for the defendant, that notwithstanding all of the penalties inflicted by the laws of the State against the vice in question, the evil always had and would continue to exist, and therefore recognizing this fact, authority was given to the city within its limits to regulate, and assist the laws of the State in regulating and restraining the vice, so as, if possible, to modify and not legalize a vice that has always been prohibited and punished, since this country had an existence and wherever civilization prevails.

It is not always safe in construing a statute to take one word used in a single clause thereof, and find the definition of that word, and then attempt to construe the whole law by the particular definition given to that word. We must look to other words employed or used in the law and other clauses of the law relating to the same subject matter and construe them all together, giving each word and clause some meaning, if possible, and we must, in our investigation, see whether words used in one part of the act are used as a qualification of the meaning of other words used in connection with the same subject matter.

In construing the first section of the third article of the charter of the city of St. Louis, passed in 1870, in order to get at its true meaning we must read each separate clause granting legislative power to the city with the first clause of the section prefixed thereto, in the same manner as if the first clause had been repeated at the commencement of each grant of power, or to each subject of power named. To illustrate: In reading the clause which we have been considering we should read: " The Mayor and City Council shall have power within the city, by ordinance not inconsistent with any law

of the State, to regulate or suppress bawdy or disorderly houses, houses of ill-fame or assignation."

The city authorities are here given authority to regulate bawdy-houses by ordinances which are not inconsistent with any law of the State. How, in the nature of things, can this repeal any law of the State? A saving clause is here inserted in the law, for the very purpose of preventing a constructive repeal of the law of the State. The words "regulate or suppress" are qualified and restricted to such regulations as do not conflict with any law of the State, and we have seen that even without any such restriction, if there is anything at all upon which this law can operate, or if it can have any force and the State law stand, then it cannot be construed as a repeal of the former law in force at the time by implication.

The Legislature has said to the city: You may pass ordinances to regulate or suppress bawdy-houses, but in so doing you shall not pass any ordinance which conflicts with or is inconsistent with any law of the State. This leaves no room for repeal by implication. You must look for some method or manner of regulating this evil which will not conflict with the laws of the State, and I insist that many regulations of such houses might be made by the city which would not conflict with the law of the State under which the defendant was prosecuted. The city might enact ordinances prescribing rules requiring the keepers of such houses, under penalties, to close the doors of their houses, and prohibiting them from receiving visitors after a certain hour in the night, or they might be prohibited from keeping any sign over their door or other designation of the character of their house, or the city might by ordinance compel the keepers of such houses to keep a sign or something at their door to designate the character of their house, so that the inmates could be readily avoided by society.

I might name many regulations that could be prescribed by the city for the government of such houses, all of which would be consistent with the laws of the State. And I understand from the rule laid down in the authorities before cited

that when this law can have any effect that is consistent with the law of the State, the State law will not be repealed by implication, even where there is no saving or negative clause in the act.

It has been urged, however, in this case that the first part of section 1 of the third article, of the city charter before referred to, is general in its terms, while that clause giving the city the power to regulate or suppress bawdy-houses is special in its application, and that in such case the special power conferred is to be considered as an exception to the previous general clause. This position might be correct if the facts in the case would justify the application of such a rule; but in this case the rule has no application. This rule can never obtain where the first clause of the act amounts to a limitation or restraint by express terms on the latter clause, and, in the law being considered, both clauses are special. Each relates to the city of St. Louis; one says that the city of St. Louis may exercise certain legislative authority; the other restrains and limits the same authority to the making of ordinances not conflicting with the laws of the State. Each part of the law only applies to the city of St. Louis, the one having no more general application than the other. In such case, how can it be said that the clause of the act conferring the power on the city is an exception to that clause expressly limiting its operation to subjects not inconsistent with the laws of the State? This may be the law, but I must confess that my mind has never been instructed in that school of logic which would enable me to perceive, or understand, the reasoning by which such a result is arrived at.

We are referred, however, to the case of the State vs. Binder, decided by this court (38 Mo., 450), as a case in which the very point being considered in this case was decided in favor of the views taken by the defendant, and as being conclusive on the subject. The defendant in that case was indicted under the law of 1855, which made the selling of any article on Sunday, or the keeping open of any establishment for such sale, an offense which was indictable and punishable

State v. Clarke.

by fine, &c. It was insisted in that case, that the statute under which the defendant was indicted had been repealed so far as it applied to the citizens of St. Louis county (where he was indicted) by a subsequent act of the Legislature, approved March 4, 1857. By this last act it was provided, " that the corporate authorities of the different cities in the county of St. Louis shall have the power, whenever a majority of the legal voters of the respective cities in said county authorize them so to do, to grant permission for the opening of any establishment or establishments within the corporate limits of said cities for the sale of refreshments of any kind (distilled liquors excepted) on any day in the week." There was another section in the act prohibiting the sale of distilled liquors on Sunday, and by the last section of the act all laws and parts of laws conflicting with the provisions of the act were expressly repealed. It was shown in that case, that the city, where the defendant resided, and where the offense was charged to have been committed, had been authorized by the vote of the people required by the law to permit persons to open such establishments on Sunday, and that the city had regularly permitted him to open on Sunday the establishment, for the doing of which he was indicted. It was very properly held in that case, that after the vote of the people had been properly given under the statute authorizing the city to permit the opening of the house on Sunday, and after the city had given the permission, the law, under which the defendant was indicted, was thereby repealed. It will be at once seen that that case had no analogy to the one under consideration. The statute in that case expressly authorized the city, after the vote was given, to permit the very act to be done for which the defendant was indicted. This express provision necessarily repealed the act under which the defendant was indicted. The two acts were in direct opposition to each other, and in such case there is no doubt but the general law is repealed so far as the special case is concerned; but the Legislature did not in that case leave the question of repeal to be decided by construction, but expressly repealed all laws conflicting with the special law.

In the case under consideration, the State law, under which the defendant was prosecuted, was not repealed by any express repealing clause, but, on the contrary, it was expressly provided, that it should not be repealed by implication, by providing in the law, that conferred the power on the city to pass ordinances regulating the avocation of the defendant, that no ordinance should be passed that was in conflict with the law of the State. I cannot therefore see how the case of the State vs. Binder can justly or properly be relied on by the defendant as an authority in her favor. In my judgment the law relied on by the defendant did not confer any power on the city to pass the ordinance relied on by the defendant as a defense to the prosecution against her. I will not attempt a discussion of the questions, raised and so ably argued by the attorneys on the argument of the case, as to the constitutionality of the ordinance passed by the city and relied on by the defendant. I have neither the time nor the ability to do so, nor will I attempt to discuss the policy adopted by the city for the purpose of regulating the evil to which it refers. It may be, that there are some offenses usually prohibited and punished by law, that are so blended and interwoven with human nature that it would be better to adopt some policy by which they could be regulated and controlled, than to attempt to entirely prohibit and suppress them; and it may be that the occupation of the courtesan is one of them. I should be rejoiced to know that some plan had been discovered by which such an evil to society could be mitigated; but with that we have nothing to do in the decision of this case. I have no inclination to enter into a discussion of such a subject on this occasion, my only object being to give a reason, which is at least satisfactory to myself, for reluctantly withholding my assent to the judgment and decision rendered in this case by a majority of the court.

In this opinion Judge Sherwood concurs.