# CITY OF ST. LOUIS v. ATLANTIC QUARRY AND CONSTRUCTION COMPANY, Appellant.

### Division One, June 29, 1912.

1. **MUNICIPAL CORPORATIONS: Powers: Statutes Applicable: Constitutional Law.** Municipal corporations are created by statute, and they possess' no powers or faculties not conferred upon them, either expressly or by fair implication, by the law which creates them, or by other statutes applicable to them.

2. ———: ———: ———: ———: **Ordinance: Forbidding Rock Quarry Except Upon Permission of City Council.** An ordinance of the city of St. Louis prohibiting, under penalty, the operation of a stone quarry without permission of the municipal assembly, is void, because, while the city is given by its charter the power to regulate the quarrying of stone, the power to prohibt it is withheld by its exclusion from the enumeration of the things which may be prohibited; and the ordinance is not made regulatory by the clause therein providing for the operation of stone quarries with the permission of the municipal assembly.

3. ———: ———: **Constitutional Law: Special and Local Laws.** Clauses 26 and 32 of section 53, article 4, of the Constitution of Missouri, forbidding the passage by the Legislature of special laws and those granting special privileges, apply to municipal corporations as well as to the State Legislature.

Appeal from St. Louis City Court of Criminal Correction.—*Hon. H. N. Moore,* Judge.

REVERSED.

*David Goldsmith* for appellant.

The ordinance on which this proceeding is based is unconstitutional. In re Kelso, 147 Cal. 609; 2 Dillon on Mun. Corp. (5 Ed.), sec. 695, p. 1061; Charter of St. Louis, art. 3, sec. 34; Cotting v. Stock Yards, 183 U. S. 112; Soon Hing v. Crowley, 183 U. S. 709; State v. Bixman, 162 Mo. 71; St. Louis v. Spiegel, 90 Mo. 587; St. Louis v. Spiegel, 75 Mo. 145.

*Lambert E. Walther* and *William E. Baird* for respondent.

The city of St. Louis has the power to prescribe the conditions upon which a stone quarry may be operated; the provision in the ordinance in question that a special ordinance shall be secured for the operation of a quarry, and the provision that this condition shall not affect those who were operating quarries at the time of the passage of the ordinance in question, are not discriminative, but are the exercise of a valid charter power. Charter, art. 3, sec. 26, cls. 6; Dillon on Mun. Corps. (5 Ed.), 598; City v. Howard, 119 Mo. 47; City v. Fischer, 167 Mo. 654; Fischer v. City, 194 U. S. 361.

BROWN, C.—This cause was instituted in the first district police court of the city of St. Louis, August 15, 1905, by filing the following statement:

"Atlantic Quarry & Construction Co., a corporation,

"To the city of St. Louis, Dr.,

"To five hundred—no-100 dollars, for the violation of an ordinance of said city, entitled "An Ordinance in revision of the General Ordinance of the City

of St. Louis,'' being ordinance number 19991, section 615, approved April 3, 1900.

''In this, to-wit: In the city of St. Louis, and State of Missouri, on the 8th day of August, 1905, and on divers other days and times prior thereto, the said Atlantic Quarry and Construction Company, a corporation, duly organized and existing under and by virtue of the laws of the State of Missouri, did then and there operate, carry on and work a stone quarry on a lot of ground situated at the southwest corner of Bernard street and Montrose avenue, in the city of St. Louis, Missouri, without permission to do so having been first obtained from the municipal assembly of said city by proper ordinance. It is further alleged that the said stone quarry was not operated, carried on or worked at the time of the approval of the aforesaid section 615 of ordinance 19991 of said city of St. Louis, Missouri.

''Contrary to the ordinance in such case made and provided.

''On information of Arthur Ryan.

''THOS. ANDERSON,

''City Attorney of the city of St. Louis.''

A judgment for one hundred dollars was appealed to the St. Louis Court of Criminal Correction where a trial resulted in a verdict and judgment for the same amount, which is brought here by appeal. The ordinance mentioned in the statement is as follows:

''It shall not be lawful for any person, company of persons, firm or corporation, to work a stone quarry or to operate, conduct or carry on a brick kiln, or a soap factory, or a slaughter-house, or a garbage works, or a bone factory, or a rendering factory, or a livery stable, or a vitriol factory, or a tannery, or candle works in any building or on any lot of ground in the city without permission to do so has been first obtained from the municipal assembly by a proper ordinance, nor shall any existing house, shed or structure be used,

altered, changed, removed or repaired so as to establish, conduct, open, carry on or maintain any such business or occupation therein without similar authority. Any person, company of persons, firm or corporation violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than one hundred nor more than five hundred dollars for each and every day such stone quarry, brick kiln, soap factory, slaughterhouse, garbage works, bone factory, rendering factory, livery stable, vitriol factory, tannery or candle works is worked, operated or carried on without the authority of the municipal assembly so to do by proper ordinance. Provided, however, that nothing in this section shall be deemed to apply to any person or company of persons, firm or corporation who shall at the time of the passage of this section be operating or carrying on a stone quarry, or a brick kiln, or soap factory, or slaughter-house, or garbage works, or bone factory, or rendering factory, or livery stable, or vitriol factory, or tannery, or candle works, at or in the premises occupied by them at the time of the passage of this section.'' [McQuillin's Municipal Code, p. 553, sec. 615.]

The testimony tended to show that the defendant at the time charged was doing the work complained of for the Terminal Railroad Association of St. Louis, as assignee of Louis Skrainka and Michael Hanick, in pursuance of a contract in writing between the said association as party of the first part and the said Skrainka and Hanick as party of the second part the material portion of which is as follows:

''That in consideration of the payments and covenants hereinafter mentioned, to be made and performed by said party of the first part, the said parties of the second part hereby agree to execute the following described work, to-wit:

''Any or all the necessary rock excavation on city blocks numbered 2550, 2551, 2552, 2237, 2238, 2239, 2240

and part of block 2553, of the city of St. Louis and adjacent streets within these blocks; said excavation to be made to an established grade as directed by the engineer of the railroad company or its representative, and the work to be done in such manner and at such points as the engineer of the railroad company or its representative may direct. The party of the first part agrees to remove all the earth excavation above the rock.

"The party of the first part reserves the right as to how much of the rock the second party may excavate. The party of second part agrees to deliver to the party of the first part all of said rock, or such portion thereof as party of the first part may demand during the time of excavation, in the form of riprap and macadam at $2.25 per square of 100 cu. ft. for riprap f. o. b. cars at quarry tracks and $2.50 per square of 100 ft. for macadam f. o. b. cars quarry track. The party of the second part further agrees to satisfy the daily demand of the party of the first part not to exceed ———— squares per day.

"It is understood that the meaning of this contract is to insure the excavation to a grade of solid rock located on city blocks mentioned. All work to be performed in a thorough workmanlike manner and with such dispatch as may be required by the party of the first part."

The work consisted in reducing the land to the proper level for the tracks of the Terminal Association by removing the material, consisting of "strippings" and solid rock to a depth of from a few inches to twenty feet, and also removing solid rock below the grade so as to make a hole in which to put the "strippings," which would otherwise have had to be moved, at great cost, to a dumping ground at East St. Louis. At the time this proceeding was instituted, a hole had been excavated about two hundred and fifty feet long,

St. Louis v. Construction Co.

eighty feet wide and seventy-odd feet deep. The rock to be moved was broken and crushed on the ground, to be used as provided in the contract. The work was done under the supervision of the engineer of the Terminal Association. The title to the land is in a trustee for the Terminal Association, which is in possession.

The defendant requested the following instruction, among others: "The court declares the law to be that if the Terminal Railroad Association at the time mentioned in the complaint herein was owner of the property described in the complaint herein, and as such owner made and entered into the contract in writing with Hanick and Skrainka which was read in evidence and that all the work of excavating was done under and by virtue and authority of said contract, then the defendant is not guilty of a violation of section 615 of the revised ordinances of the city of St. Louis."

It was refused and defendant excepted.

During the trial, and in its motion for a new trial, the defendant insisted upon the several constitutional questions suggested in this opinion.

Municipal corporations, with us, are created by the statute. They possess no powers or faculties not conferred upon them, either expressly or by fair implication, by the law which creates them, or by other statutes applicable to them. [1 Dil. Mun. Corps. (5 Ed.), sec. 33.] Every investigation, therefore, relating to their powers, must be conducted from the standpoint of the law to which they owe their existence. The charter of the city of St. Louis is founded upon express provisions of the Constitution itself, which direct not only that it shall be subject to the Constitution and laws of the State, but that it shall be *in harmony* with them. It also requires "a house of legislation," leaving no doubt as to the legislative character of the municipal assembly which was created by its authority. [Constitution, art. 9, sec. 22.]

Among the legislative powers expressly delegated by the charter to the mayor and municipal assembly (art. 3, sec. 26, clause 6) are the following: "To establish and regulate hospitals, and to secure the general health of the inhabitants by any measure necessary; to regulate stone quarries and quarrying of stone, and the slaughter of animals; provide for the erection, management and regulation of slaughter-houses; prevent the driving of stock through the city; prohibit the erection of soap factories, stockyards, and slaughter-houses, pigpens, cow stables and dairies, coal oil and vitriol factories within prescribed limits, and to remove and regulate the same; and to regulate or prevent the carrying on of any business which may be dangerous or detrimental to the public health, or the manufacture or vending of articles obnoxious to the health of the inhabitants; and to declare, prevent and abate nuisances on public or private property, and the causes thereof." It will be noted that these powers are distinctly classified with reference to the power to "regulate," and the power to prevent or prohibit, except so far as it relates to the general power to protect the public health, with respect to which it is, of course, impossible to specify in advance the subjects which may arise to call for municipal interference. The quarrying of rock is one of those things as to which the power to prohibit is carefully withheld. We do not have to go to the books to ascertain that it is not a nuisance *per se*. We see this in the wonderful excavations that contain so important a part of the commercial and industrial activity of some of the great cities of Europe and America; conditions to which even the judges of courts cannot close their judicial eyes. We must take judicial notice of the immense underground terminals and subways of New York, excavated from solid rock, which has in its turn been made to serve the constructive purposes of the improvement, as well as of the city which sits above them. In this

case, however, the Legislature has relieved us from the consideration of this question by determining it in the charter. It does not delegate to the mayor and assembly the power to prevent or prohibit the working of stone quarries, but excludes such a construction by a careful enumeration of the cases in which the power to "prevent" or "prohibit" is granted, as well as by the use of the word "regulate," to describe the whole extent of the power delegated with respect to stone quarries. Of this word Judge NAPTON, in State v. Clarke, 54 Mo. 17, 34 said: "The meaning of the word 'regulate' has been discussed in this case; but it is a word which from its Latin origin needs no explanation. It certainly implies the continued existence of the subject-matter to be regulated." There is no doubt that this business, if carelessly conducted is annoying and even dangerous in its nature, and requires the most careful oversight on the part of the public, and it may be and probably is true that this oversight involves, as far as due regard for the rights of private property makes it practicable, the right to designate where that class of work may be carried on. In this case, however, the ordinance contains a sweeping prohibition against working a stone quarry, unmodified by any qualification or condition except the implied permission to apply to have it repealed as to such applicant in the arbitrary discretion of the same legislative body that enacted it, on such terms as it may see fit to impose. This suit is founded solely upon the prohibitive ordinance. It does not imply that the work has been so conducted as to be a nuisance. The charge is simply that the defendant works a stone quarry in the city of St. Louis without permission to do so having been first obtained from the municipal assembly by proper ordinance.

As we have already seen, the charter gives the municipal assembly no power to prohibit the operation of stone quarries in the city of St. Louis, so that the only question for us to consider is whether the prohibi-

tion under which this action was instituted is transformed into a regulation by the implied permission which it contains to apply to the municipal assembly for the passage of another ordinance. We know of no better definition of the thing which constitutes "regulation" in the sense we are now considering it than that which is contained in the syllabus of Montgomery v. West, 42 So. 1000. It is as follows: "A city charter authorized the city to suppress nuisances in the manner directed by the city council, which had power to perform any acts incident to bodies corporate. An ordinance forbade the operation of steam engines, planing mills, foundries, blacksmith shops, etc., within the city without first obtaining the consent of the council. Held, invalid, in that it failed to prescribe a uniform rule of action, but reserved to the council the right to grant or withhold the privilege arbitrarily." It is absolutely within the discretion of the municipal assembly whether it shall pass the permissive ordinance or not. If it does not a lawful business has been destroyed, if the theory of the city is correct, without any opportunity for redress. In St. Louis v. Russell, 116 Mo. 248, Judge Burgess, in the opinion of this court holding void an ordinance of the city of St. Louis providing that "No livery, boarding or sale stables shall be located on any block of ground in St. Louis without the written consent of the owners of one-half the ground of said block," cited a large number of cases in which the position we have taken in this opinion is upheld. To these we add the following: Yick Wo v. Hopkins, 118 U. S. 356; Plymouth v. Schultheis, 135 Ind. 339; Bills v. Goshen, 117 Ind. 221; Elkhart v. Murray, 165 Ind. 304; Winthrop v. Chocolate Co., 180 Mass. 464; Austin v. Murray, 16 Pick. 126; State v. Tenant, 110 N. C. 609; Boyd v. Frankfort, 117 Ky. 199; Barthet v. New Orleans, 24 Fed. 563.

It has been said that it is not to be assumed that councils or officers in exercising the dispensing power

will act arbitrarily, or otherwise than in the exercise of a sound discretion. In the chocolate company case above cited the court disposed of that question as follows: ''Nor is it any answer to say, that the whole matter is left to the selectmen, and that they may be presumed to act in a reasonable manner. It does not expressly or by necessary implication require them to adjudicate and determine that it is necessary to prohibit the proposed erection and use for the prevention of fire or the preservation of life, but leaves them to act upon any reason whatever. It cannot be said that such a by-law is authorized by the statute.''

There is another answer which, it seems to us, can be made to the same suggestion. It is the answer given by the people of this State in section 53 of the fourth article of our present Constitution, which forbids the passage by the General Assembly of any local or special law (clause 26) ''granting to any corporation, association or individual any special or exclusive right, privilege or immunity,'' and by ordaining as a further security to the citizen against prejudice or favor, and in favor of equality before the law, that (clause 32) ''where a general law can be made applicable, no local or special law shall be enacted; and whether a general law could have been made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on that subject.'' These provisions of the Constitution of 1875 are founded in the conviction that personal and property rights of the citizen have need of protection against the arbitrary and irresponsible exercise of the legislative power— arbitrary because the motive of the Legislature cannot, in the absence of some constitutional restriction, be questioned, and irresponsible because legislators are not responsible in damages for injuries suffered by reason of their legislative acts. It is illogical to suppose that, in matters affecting the security of the citizen

with respect to his person and property, the municipal corporation, in its legislative capacity, should not be subject to the same restrictions as the Legislature from which it derives its powers. This question also presented itself to the people in their capacity of makers of the organic law, so that in authorizing the charter which we are now considering they provided, as we have already seen, that it "shall be in harmony with and subject to the Constitution and laws of the State." The Constitution is largely devoted to the restriction of the legislative power in the granting of special privileges, and in the enactment of special and arbitrary legislation affecting the rights of the people, and we cannot harmonize with these restrictions an unlimited power to grant special privileges, and by special legislative act to discriminate between individuals of a municipality with respect to the use of their property and the conduct of their business. This court has expressly held in Carroll v. Campbell, 108 Mo. 550, and Carroll v. Campbell, 110 Mo. 557, that the restriction we have quoted applies to municipal corporations as well as to the State Legislature. If they seek, by ordinance, to regulate citizens in the lawful use of their property, or the lawful conduct of their business, they must specify the rules and conditions to be observed in such use or business, so that all citizens alike may comply with them, and must not exercise, nor create or permit the opportunity for the exercise, of arbitrary and uncontrolled discrimination between citizens so complying; otherwise such ordinance will be void. It sounds well to say that we will presume, in the construction of these laws, that municipal legislators will do their duty honestly and fairly, without prejudice or favor, but in administering them, this court has continually recognized that they sometimes try, even by fraudulent means, while pretending to act within their powers, to exceed and abuse them. For instance, in Kansas City v. Hyde, 196 Mo. 498, the ordinance in question was

properly characterized (p. 500) as a "scheme" under the guise of exercising the undoubted power to open a street, to force through defendant's land a right of way for a railroad company. A legal maxim which may have the effect to close the eyes of the courts to such dangers, should be carefully scrutinized before using, so that it may be confined to legitimate purposes.

The ordinance under which this proceeding was instituted in so far as it purports to make it unlawful for any person, company of persons, firm or corporation, to work a stone quarry in the city of St. Louis, is void because in excess of the power delegated in the charter, and it is not converted into an ordinance merely *regulating* the working of that industry by the addition of the words "without permission to do so has been first obtained from the municipal assembly by a proper ordinance." This does not conflict with the decision of this court in St. Louis v. Fischer, 167 Mo. 654. That case arose under a clause of the same paragraph of the St. Louis charter, which gives the city the power "to *prohibit* the erection of cow stables and dairies within prescribed limits." The question was stated by the court (using its italics) as follows: "At the outset it will be observed that *express power* is conferred upon the mayor and municipal assembly to *prohibit,* and to remove and regulate cow stables and dairies *within prescribed limits.*" It was held that it was competent to fix the boundaries of the city as the prescribed limits (p. 661).

The judgment of the St. Louis Court of Criminal Correction is accordingly reversed.

*Bond, C.,* dissents.

PER CURIAM. — The foregoing opinion of Brown, C., is adopted as the opinion of the court. All the judges concur,—*Woodson, J.,* in separate opinion.

CONCURRING OPINION.

WOODSON, J.—I concur fully in the opinion written by our learned Commissioner, Mr. BROWN, not only for the lucid reasons stated therein, by him, but also for the reasons so well assigned by our learned Commissioner, Judge BOND, in the opinion written by him in the case of City of St. Louis v. Driesoerner, involving the same question, delivered by this court on May 31, 1912. [243 Mo. 217.]