## THE BROOKLYN CENTRAL RAIL ROAD COMPANY *vs.* THE BROOKLYN CITY RAIL ROAD COMPANY.

## THE BROOKLYN CITY RAIL ROAD COMPANY *vs.* THE BROOKLYN CENTRAL RAIL ROAD COMPANY.

Rights acquired under a statute which is, in its nature, a contract, and which does not reserve to the legislature the power of repeal, cannot be divested by subsequent legislation.

The resolution of the common council of the city of Brooklyn, of the 19th of December, 1853, by which it signified its assent to the construction of the rail road over the routes designated in the articles of association of the Brooklyn City Rail Road Company, upon the condition annexed thereto, was authorized by the 5th subdivision of the 28th section of the general rail road act, and therefore lawful; and the acceptance thereof, with the conditions annexed, by the rail road company, constituted a contract, which the company was bound to perform, and which the common council could not rescind, without adequate cause. SCRUGHAM, J. dissented.

The grant to the Brooklyn City Rail Road Company, and its acceptance upon the conditions annexed, with the duties and obligations and large expenditures resulting therefrom, invested the company with the right of property in the franchise, of which it could not be deprived without its consent, or against its will.

The Brooklyn and Jamaica Rail Road Company was incorporated by an act of the legislature, passed April 25th, 1832, with the right to construct a rail road, commencing at an eligible point within the village of Brooklyn,

Brooklyn Central R. R. Co. *v.* Brooklyn City R. R. Co.

and extendiing to any point within the village of Jamaica, with lateral rail-ways to the villages of Flatbush and Flushing. The grant was not to com-mence at several points, but at one point in Brooklyn. It was not to ramify itself through the several streets of the city, at any and at all times there-after, but to run from the one point direct to another point in the village of Jamaica. The company accordingly located its western terminus at the foot of Atlantic street, Brooklyn, and its eastern in the village of Jamaica, where they had ever since remained. *Held*, that the company, having made its location, and adhered to it for many years, was concluded by what it had done; and that it had no franchise in Furman street, which it could assign to another company. SCRUGHAM, J. dissented.

A rail road cempany being authorized, by grant from the legislature, to con-struct and operate a rail road through the streets of a city, and the com-mon council of the city having given its assent to the construction of the road by the company, upon the route designated in its charter, on certain con-ditions; *Held*, that the common council had no power, by resolution, to an-nul or impair the grant to the company on account of its failure to complete the road within the time limited by the conditions annexed to the assent of the common council. SCRUGHAM, J. dissented.

*Held, also*, that the condition to complete the road within a given time, was a condition subsequent; the franchise vesting in the grantee subject to be de-feated by its omission to perform the condition. That the omission did not *ipso facto* determine the estate, but exposed it to be determined at the election of the grantor. But that nothing short of a judicial decision upon the question could deprive the grantee of the franchise, or impair its rights of property therein.

When a rail road has been laid down in a public street of a city, in pursuance of a grant from the legislature and the assent of the municipal authorities, it does not become a part of the street, so as to authorize the public at large, and other rail road corporations, with the consent of the common council, to use the road with the appropriate cars or carriages for the transit of passengers, in common with the owners of the franchise.

Any rule which would recognize the right of the public, and such other cor-poration as the municipal authorities might choose to license, to the indis-criminate use of a railway constructed in a public street, on the ground that it was a part of the public easement, would be destructive of the entire system of city rail roads. *Per* BROWN, J.

THESE were appeals from an order made at a special term, dissolving an injunction obtained by the Brooklyn City Rail Road Company; and from an order denying the motion of that company to dissolve an injunction obtained by the Brooklyn Central Rail Road Company.

*J. W. Gilbert,* for Brooklyn Central Rail Road Company.

*G. T. Jenks,* for Brooklyn City Rail Road Company.

BROWN, J. The plaintiffs and the defendants in both these actions are corporations duly organized and created under the laws of the state, with the power and for the purpose of constructing railways and operating rail road cars with horses and mules over certain streets in the city of Brooklyn. The City Rail Road Company was organized anterior to the 19th day of December, 1853, but the precise day does not appear upon the papers, nor is it shown when the Central Company was organized, but it was some years after the organization of the other company had been perfected.

Furman street is one of the routes designated in the articles of association of the City Company and in the resolutions of the common council of the city signifying its assent to the construction of the railway. It runs from the foot of Fulton street to the foot of Atlantic street; one of its termini being very contiguous to the Fulton Ferry, and the other to the South Ferry, and in its course it passes conveniently near the Wall street Ferry at the foot of Montague street. The street is thus in immediate communication with the three ferries upon the shores of the river or bay, and which are the great channels of communication between the cities of Brooklyn and New York. Before the commencement of the litigation, the Central Company was operating a horse railway from the South ferry along Atlantic street to Bedford, a point in the eastern section of the city. This was its only line. The City Company at the same time was operating several routes, all having a common terminus at the Fulton Ferry. In May, 1860, in completion of one of the routes claimed under its charter, which should pass from Fulton ferry along Furman street, to and across Atlantic street into Columbia street, where it intersects Atlantic nearly opposite Furman street, and from thence into the southern part of the

city, the City Company had constructed a railway in Furman street at its own expense and for its own exclusive use. The Central Company thereupon asserted a claim or right to the use of the railway in common with the City Company, and commenced its action and obtained an injunction from Mr. Justice Scrugham, restraining the City Company from interfering with the Central Company in the use of the railway thus constructed, and from bringing or instituting any suits or taking any legal proceedings to prevent the use of the railway by the Central Company. It then commenced running its cars upon the railway. The injunction was subsequently modified by the removal of the restriction upon the institution of legal proceedings. The City Company thereupon commenced their action against the Central Company, and obtained from Mr. Justice Emott an injunction restraining the last named company from the use of the railway. This injunction was afterwards, upon the motion of the Central Company, dissolved by an order made at a special term, and the justice holding the special term at the same time denied the City Company's motion to dissolve the injunction obtained by the Central Company. From both orders the City Company appealed to the general term. The question involved is the same in both actions, and is the right of the City Company to the exclusive use of the railway laid down by it in Furman street.

There are some things which appear from the papers in these motions which admit of no sort of dispute. And as they will serve to exhibit the rights and claims of the contending companies in a clear and conspicious light, I will proceed to state what they are.

The City Rail Road Company was established and commenced operating portions of its route long before the Central Rail Road had any being, and while the scheme of railways for cities was yet in its infancy, and an untried and hazardous experiment. Its organization was effected under the act to authorize the formation of rail road companies and

to regulate the same, passed April 2d, 1850, and its charter or articles of association designated the routes or streets of the city over and through which its rail road was designed to be constructed, and Furman street, the route in litigation, is one of them. The 5th subdivision of the 28th section of the act required the assent of the corporate authorities of the city of Brooklyn before the company could proceed with the work. This assent was given, by a resolution of the common council, passed December 19th, 1853, and approved by the mayor on the 22d of the same month. There were certain conditions annexed to the consent, which involved necessarily the expenditure of very considerable sums of money by the company, and imposed upon it duties and obligations of an onerous character. Among these is the obligation to construct bridges for the passage of the water; the maintenance of the pavement within the track of the road, and for the space of three feet on each side thereof, in thorough repair, under the direction of the common council; the transportation of passengers at certain prescribed rates of fare; the payment of license fees for each car run upon the railway, and the complete construction of the railway over the given routes by a day named in the resolution; the execution of a good and sufficient bond in the sum of $200,000, conditioned for the faithful performance of the prescribed conditions. It is not claimed that the company have failed in the performance of the conditions upon which the assent of the common council was given, except that in regard to the construction of the entire road within the time therein limited. On the contrary the railway has been made, and in successful operation for a number of years. Passengers have been transported at the prescribed rates of fare—the pavements have been kept in repair—the requisite bond executed, and the license fees, from time to time, paid into the city treasury.

The 2d section of the act of the 23d March, 1854, in relation to the Brooklyn City Rail Road Company, was designed to confirm, as far as it needed confirmation, the title of the

company to the franchise claimed, for it declares in express words that " the said company are hereby authorized to construct and operate their said rail road over the several routes mentioned in their articles of association." This grant is to construct and operate, and therefore comprehended as well the finished as the unfinished routes referred to in the charter. It is a grant of the franchise, with all the incidents, from the sovereign power of the state, and so far as I can see has not been repealed or modified in any degree. Its effect is to relieve the company from all dependence upon the common council of the city for leave to lay down its track upon the streets of the city mentioned in the articles of association, if such assent had not been previously obtained.

The second section of the act to which I last referred also contained an authority to the company to continue their said road " from the termination thereof respectively as designated in the said articles of association, subject to the provision of the act to authorize the formation of rail road companies and to regulate the same, passed April 2d, 1850, into or through any town in the county of Kings," &c. The qualifying clause " subject to the provisions of the act authorizing the formation of rail road companies," does not apply to the first clause of section 2, which grants the power to construct and operate the road upon the route designated in its charter; but to that portion of the section which provides for the continuation into and through other towns of the county of Kings.

There is another undisputed fact in the case which must not be omitted in this connection; and that is, that the City Rail Road Company, in execution of the power to which I have referred, proceeded at its own expense and with a view to its own exclusive use, to construct and lay down the railway in Furman street which is the subject of this litigation. In the case of *The State of New York* v. *The Mayor &c. of the City of New York*, (3 *Duer*, 119,) the superior court held that a resolution of the common council granting to Jacob Sharpe and others the right on certain conditions to construct

a rail road in Broadway and to run cars upon it, was not an act of legislation, nor a law, in the proper sense of the term, but the grant of a franchise, and when accepted by the grantee, became a contract upon the terms and conditions set forth in the resolution and ordinance. And inasmuch as the common council had no power to release the control over one of the principal streets of the city, its resolution and the grant claimed under it was declared to be invalid and void. The resolution of the common council of the city of Brooklyn of the 19th December, 1853, by which it signified its assent to the construction of the rail road over the routes designated in the articles of association of the City Rail Road Company upon the conditions annexed thereto, was authorized by the 5th subdivision of the 28th section of the general rail road act, and therefore lawful, and the acceptance thereof with the conditions annexed by the City Company, constituted a contract which the company was bound to perform, and which the common council could not rescind without adequate cause. Rights acquired under a statute of a state, which is in its nature a contract, and which does not reserve to the legislature the power of repeal, cannot be divested by subsequent legislation. In *Dartmouth College* v. *Woodward*, (11 *Wheat.* 511,) it was held that immunities, franchises and other rights, whenever they are the subject of a contract or grant, are as much within the reach and protection of the constitution of the United States as any other grant. The grant to the City Rail Road Company, and its acceptance upon the conditions annexed, with the duties and obligations and large expenditures resulting therefrom, would seem, therefore, upon the principles I have endeavored to state, to invest the company with the right of property in the franchise, of which it cannot be deprived without its consent or against its will.

By a reference to the complaint of the Brooklyn Central Rail Road Company, in the first of the above entitled actions, and upon which it obtained its injunction, it will be seen

that its claim to the use of the railway in Furman street is placed upon two grounds.

*First.* The Central Rail Road Company claim that the Brooklyn and Jamaica Rail Road Company had the right by grant from the legislature of the state to construct and operate a rail road through the streets of the city of Brooklyn, which right or franchise had been duly assigned over by the Jamaica Company to the Central Company. It also claims that on the 29th November, 1859, the common council of Brooklyn adopted certain resolutions which recited that the Brooklyn City Rail Road Company did not construct a rail road through Furman street by the 1st day of December, 1855, conformable to one of the conditions annexed to the assent of the common council given to that company to construct the road upon the route designated in its charter. And that the Brooklyn and Jamaica Company was desirous of extending its road through Furman street, which was manifestly for the public advantage. It was therefore resolved that the assent of the common council was given to the Jamaica Company or its assigns to extend its road through Furman street to Fulton street, and that the City Rail Road Company have the right to use the said track of said road in common with the Brooklyn and Jamaica Company or their assigns, provided it united with the Jamaica Company in constructing its road and bearing an equal part of the expenses, &c. To make this claim of any avail it must appear that the Jamaica Company had a franchise for a road in Furman street which it could assign, and then that the common council had power and authority by its own vote to annul and impair the rights acquired by the City Company under the grant to it. Neither of these propositions can be maintained. The Jamaica Company was incorporated by an act of the legislature passed April 25th, 1832, with the right to construct a rail road commencing at an eligible point within the village of Brooklyn, and extending to any point within the village of Jamaica, with lateral railways to the villages of Flatbush and Flushing. The

grant was not to commence at several points, but at one point in Brooklyn. It was not to ramify itself through the several streets of the city at any and at all times thereafter, but to run from the one point direct to another point in the village of Jamaica. The company accordingly located its western terminus at the foot of Atlantic street, and its eastern in the village of Jamaica, where they have ever since remained. Having made its location and adhered to it for many years, it is concluded by what has been done. It had no franchise in Furman street which it could assign to the Central Company. The common council were equally without the power to annul or impair the grant to the city company for failure to complete the road within the time limited by the conditions annexed to the grant, in the summary manner claimed. I do not rely so much upon the express grant to the company by the 2d section of the act of the 23d March, 1854, as I do upon the general principles which govern conditions of the kind referred to. Speaking of franchises, Chancellor Kent, in his Commentaries says, (*vol.* 3, *p.* 458,) " they contain an implied covenant on the part of the government not to invade the rights vested, and on the part of the grantees to execute the duties and conditions prescribed in the grant. The government cannot resume them at pleasure, or do any act to impair the grant, without a breach of the contract." He also says at page 459, that " an estate in such a franchise and an estate in land rest upon the same principles, being equally grants of a right and privilege for an adequate consideration." It was said by Chief Justice Holt, (12 *Mod. Rep*, 271,) that all franchises are granted upon condition that they shall be duly executed according to the grant, and if the grantee of such franchises neglect to perform the terms, the patents may be repealed by *scire facias.* If the Central Company claim that the common council have the right to annul or impair the grant to the City Company for a breach of the condition to complete the work in the given time, it encounters this impediment. The condition to complete within a given time is

one of those distinguished in the law as conditions subsequent. The effect of a deed with a condition subsequent is to vest the estate in the grantee subject to be defeated by his omission to perform the condition. The omission does not *ipso facto* determine the estate, but exposes it to be determined at the election of the grantor. These conditions, and forfeitures consequent thereon, are not favored in law, because they tend to destroy estates. When the grantor institutes proceedings to recover the estate, for conditions broken, the grantee may show that its performance has become impossible by reason of the acts or omissions of the grantor, or has been waived or dispensed with; and this he may do by proving a waiver in express words, or by any act or series of acts from which a waiver of the performance of the condition may be implied. Whether the routes mentioned in the articles of association of the City Company and upon which the railway is not constructed, have not been in a condition to receive the superstructure of the road through the neglect or inability of the city government, as was suggested upon the argument, or whether the taking of the bond referred to the conditions, and the receipt, from time to time, of the license fees into the city treasury, are to be deemed a waiver of the performance of the condition to complete the road within the time limited, I do not propose to consider. It is enough now to say that upon these questions the City Company has a right to be heard, and that nothing short of a judicial decision upon the point involved, can deprive it of the franchise, or impair its rights of property therein.

*Second.* The Central Company next claims, in its complaint, that it has acquired a right to the use of the rail road in common with the City Company by force of a contract or agreement made by Henry R. Pierson and George S. Howland, a committee on the part of and empowered to act for the latter company with a like committee on the part of the Central Company, composed of Jacob Frost, R. H. Thompson and Ira Smith. It refers to a paper in writing annexed

to the complaint, as the instrument containing the contract. This paper is signed by Henry R. Pierson and George S. Howland, and bears date the 8th of December, 1859. They therein describe themselves as a committee from the City Rail Road Company, and say they have met a like committee on the part of the Central Company, and having conferred with them as to the mutual use of Furman street by said companies for rail road purposes, have agreed to recommend to the City Rail Road Company to permit the Central Company to use said road in Furman street upon the following terms, which are to be a lease at an annual rent, with provisions for the proper repair of the road, and fair and equitable arrangements for the common use by said parties of the roads on Atlantic street and Flatbush avenue, as each may require, and generally with full, specific and fair arrangements for the mutual protection and interest of said companies in the several roads owned by each, both by each other and from outside parties. This agreement, the complaint further alleges, was duly ratified and accepted by the board of directors of the City Company on the 12th of December. The evidence of which consists in a letter by Henry R. Pierson on behalf of the committee, of that date, in which he says : The Brooklyn City Rail Road Company, at a meeting of the board of directors, empowered the committee with authority to consummate the arrangements with the Central Company, as set forth in the memorandum of the 8th of December in reference to Furman street, and that the committee would prepare and submit a full agreement at its earliest convenience. The papers also show that drafts of agreement were prepared by the committee of the City Company and submitted to the committee of the Central Company, who proposed amendments thereto, and for causes which do not clearly appear, but which are of no sort of consequence to the present inquiry, the arrangement was never made or consummated, and no leases or agreements were executed. The question is upon

the existence of a contract which it is obligatory upon the city company to execute.

The contracting parties are corporations having a common seal and acting and expressing their assent to contracts through their board of directors and other officers. The burden of establishing the existence of this contract rests upon the Central Company. It must show that the City Company accepted and entered into the agreement, or that some persons duly authorized entered into it for the company. The two papers of the 8th and 12th of December, 1859, lack all the essential attributes of a contract. Neither of them was signed by the Central Company or any person authorized or claiming to be authorized to act in its behalf. The agreement was without mutuality, and without consideration. It is essential to the validity of a contract that the minds of the contracting parties should meet. There must be a concurrence of intention, not only upon one of the stipulations of the contract, but upon them all. By the memorandum of the 8th of December, Henry R. Pierson and his associates "have agreed to recommend to the said Brooklyn City Rail Road Company to permit the Central Road to use said road on Furman street." The rent was to be six per cent per annum upon the cost price of the road, but the cost was not specified. The time granted was not mentioned, the fair and equitable arrangements for the common use of the road on Atlantic street and Flatbush avenue, and for the mutual protection and interest of the several companies in the roads owned by each, both by each and outside parties were not prescribed or defined, but were left open for future negotiation. So long as any one material subject or stipulation of the agreement remained unconsidered and undetermined, it was not obligatory upon either party. Nor does the letter of the 12th of December furnish any evidence of a ratification of the contract by the City Company. It announced that Henry R. Pierson and committee had authority to consummate

the arrangement upon the terms of the memorandum of the 8th of December, and that it would prepare and submit a full agreement thereafter. The paper is not a ratification, and does not profess to be a ratification, of any thing. The claim of title by the Central Company to the use of the road in Furman street, so far as it rests upon the alleged contract, cannot be supported.

There is one other point made by the counsel for the Central Company which I think it worth while to notice. It is this: "That when a rail road is laid down in a public street it becomes a part of the street, and may be used as such by the people at large without permission, and by another corporation for hire, under the license or authority of this city." If this proposition had been limited to the incidental use of the track by the public in crossing over or passing along the rails and superstructure of the road with carriages and vehicles in ordinary use, there could be no objection to it, because to this extent the public must have the right to pass and repass, and may do so without the slightest interruption to the owners of the franchise. But I understand the proposition is designed to go far beyond this, and to assert the right of the public at large and other rail road corporations, with the license of the municipal authorities, to use the road with the appropriate cars or carriages for the transit of passengers, in common with the owners of the franchise. If the proposition is not designed to go thus far, it could be of no value to the Central Company upon this appeal. That there might be no misapprehension as to what was intended, we were referred, on the argument, to the iron pavements covering the entire surface of some of the streets in the city of New York, and of which all men have the common use, as analogous to the railway of the City Company in Furman street. This is novel doctrine to come from the counsel of a rail road corporation, claiming a similar franchise for itself in other streets of the city; for if it could be maintained, it

Brooklyn Central R. R. Co. *v.* Brooklyn City R. R. Co.

would be subversive of its own rights of property as it would be of those of the City Company, and indeed of every other city rail road corporation. Under such a rule who would incur the cost of laying down a railway and putting cars upon it for the accommodation of passengers ? What rules could be devised and adopted to regulate the number of vehicles employed—the rates of speed and the direction in which they are to be driven—so as to insure regular, systematic and effective use of the road and the security of passengers traveling thereon ? Rail roads are only possible in great cities, when laid down in the public streets and thoroughfares. It is there that they find the requisite space for transit, and there only that they find the passengers and furnish the requisite public accommodation. Any rule, therefore, which would recognize the right of the public, and such other corporation as the municipal authorities might choose to license, to the indiscriminate use of a railway constructed in a public street, upon the ground that it was a part of the public easement, would be destructive to the entire system of city rail roads. To become useful, profitable and free from danger, their control and management must necessarily be exclusive. The error consists in regarding the railway as part of the street, which the iron pavement doubtless is. The sills, ties, and rails are laid upon the street, but they are not a part of it. They constitute a part of the machinery for the transportation of passengers, and although placed upon the street, no more become a part of it than the cars and carriages which are placed upon the rails.

In *Davis* v. *The Mayor &c. of New York,* (14 *N. Y. Rep.* 506,) the principal question was upon the power of the common council, under its authority to regulate streets, &c. to grant to Jacob Sharpe and his associates the right to lay down and use a rail road in Broadway, and necessarily involved the question whether the proposed railway would become a part of the street. I may, therefore, quote as authority

some of the observations of Judge Denio upon that branch of the case, and from which few men will be prepared to dissent : " A rail road has no necessary relation to or connection with a common highway or street.   It may be laid along the surface of such a road when the grade will permit it, but it may equally well run through the country remote from a highway, and upon a level graduated for that purpose.   When a rail road and a highway coincide, the circumstance is simply incidental.   They are separate and distinct agencies to facilitate passage and traffic, differing from each other in many essential particulars.   The object of a highway or street is to afford to every citizen an opportunity to pass on foot, or with his horses and carriage, from one locality to another, and it is essential to the legal idea of such a road that it shall be common to all.   Now a rail road does not facilitate traveling on foot or on horseback, or with one's carriage.   It does not generally admit of these methods of passage, although when rail road carriages are not moved by the power of steam, but by horses, the tracks, when they do not rise above the street level, may be safely crossed, and to a limited extent may be used for passing lengthwise.   This, however, is only incidental, and not a necessary feature of a rail road.   Those who use a rail road for its proper purpose do not travel according to their own volition, but are transported like freight or baggage by the proprietors of the road, in their own vehicles.   But the feature which most widely distinguishes a rail road from ordinary highways and streets is that the former is a strict monopoly, entirely excluding all idea of competition. The nature of the subject requires a unity of control and management, which precludes the existence of competing carriages.   There may be rival roads, but there can be no rivalry on the same road."

This is sufficient for my present purpose, and is decisive against the right of the public or any rival corporation to use the railway of the City Company in Furman street on the ground that it became a part of the public easement.   It is

obvious that without this law of exclusive use and unity of control and management there can be no franchise, and no right of property in either company, in the railways laid down by them respectively in the streets of the city. For the legal idea of a franchise is an immunity, a privilege, a legal right to the enjoyment of something beneficial to the grantee which is withheld from others. This is not the only anomaly in the argument of the Central Company. The reasons assigned in support of the injunction not only conflict with its claim to property in its own franchise, but they are hostile to one another. *First.* It says that the City Company has lost its right to the Furman street route by neglect to complete the work within the time limited by the conditions of the grant, which has become vested in the Central Company by assignment from the Jamaica Company and the assent of the common council. *Second.* That the City Company are lawful owners of the franchise, and the Central Company their tenants and lessees under the contract of the 8th and 12th of December. *Third.* That neither company has any such right, because the railway is part of the public easement, and its use therefore common to all who may choose to enjoy it.

I conclude, for these reasons, that the Central Company has failed to establish any right to the use of the rail road in Furman street, and that the injunction order obtained in its action against the City Rail Road Company should be reversed, with the usual costs of opposing motion at the special term, and the costs of the appeal therefrom, should the City Company ultimately succeed in the action. And also that the order made at the special term, denying the injunction prayed for in the action wherein the City Rail Road Company is plaintiff, and the Central Rail Road Company is defendant, be reversed, and an order be entered directing an injunction to issue, according to the prayer of the complaint, upon filing the usual security, the form and amount of which to be settled by one of the justices of this court, and that the City Company also recover the usual costs of the

motion at the special term, and upon this appeal, should it ultimately succeed in the action.

EMOTT, J. concurred.    SCRUGHAM, J. dissented.

[ORANGE GENERAL TERM, September 10, 1860. *Emott, Brown* and *Scrugham,* Justices.]