THE ST. LOUIS RAILROAD COMPANY v. THE SOUTHERN RAILWAY COMPANY et al., Appellants.

IN BANC.

This Case Determined under the authority of the decision in Union Depot Ry. Co. v. Southern Ry. Co., ante, page 562.

Appeal from St. Louis City Circuit Court.—HON. J. A. SEDDON, Judge.

REVERSED AND REMANDED.

Lubke & Muench for Southern Railway Company, appellant, and Leverett Bell for the Mayor of St. Louis, appellant.

Hitchcock, Madill & Finkelnburg, S. P. Galt and Frank, Dawson & Garvin for respondent.

PER CURIAM.—The plaintiff in this case, though incorporated prior to the adoption of the present charter of the city of St. Louis, obtained from the city additional rights under ordinances passed since the present charter went into effect.

By one of these ordinances, approved March 27, 1883, the plaintiff agreed to "conform to any ordinance now existing or hereafter passed enforcing article 10 of the city charter, not inconsistent with the provisions of this ordinance." There is no substantial difference between this case and that of the Union Depot Railroad Company against the defendant in this case. On the authority of that case the judgment in this one is reversed, and the cause remanded with directions to the circuit court to dismiss the petition. BARCLAY, J., absent; the other judges concur.

VOL. 105—37

## CONCURRING OPINION.

THOMAS, J.—In addition to the statement of facts made by BLACK, J., in the case of *Union Depot Ry. Co. v. Southern Ry. Co., ante,* p. 562, I will state such other facts as are necessary to a full understanding of the questions involved.

From the pleadings and evidence it appeared that, after the charter of the city went into effect, said St. Louis Railroad Company accepted from the city, in the manner therein required, ordinance 12477, approved March 27, 1883, of which ordinance the following sections, numbered 4 and 5, are part: "Sec. 4. The St. Louis Railroad Company shall not be entitled to any of the rights or franchises granted by this ordinance, unless within thirty days from the approval thereof it file with the city register its written acceptance of the terms and conditions of said ordinance, and also its penal bond in the sum of $20,000, payable to the city of St. Louis, to be approved by the mayor and council, conditioned that said St. Louis Railroad Company shall and will perform and comply with all the terms and conditions of this ordinance.

"Sec. 5. It is expressly understood that, by the acceptance of the provisions of this ordinance by the St. Louis Railroad Company, said company waive all rights it may have to streets within three blocks of this railway claimed under the act of the general assembly approved January 16, 1860, and that it will conform to any ordinance now existing, or hereafter passed, enforcing article 10 of the city charter, not inconsistent with the provisions of this ordinance."

On the second day of August, 1887, ordinance number 12477 was amended by the municipal assembly, by ordinance, so as to enlarge the rights and franchises of respondent. This amendatory ordinance required respondent to file its acceptance thereof within thirty days after its passage in order to enjoy the new

franchises granted, which respondent did. A temporary injunction was granted, which on a hearing was made final, and defendant appeals.

The true relation of the city of St. Louis to the St. Louis Railroad Company is the question of prime importance in this case. The argument in support of the decree of the trial court is based upon the assumption that the city was about to attempt to appropriate the property of this company for the use of the Southern Railway Company by the exercise of the paramount right of eminent domain, and, the city having no such power under the constitution and laws of Missouri, this attempt, if the city were permitted to consummate it, would be an arbitrary and illegal invasion of the property rights of respondent, and, therefore, ought to be enjoined by a court of equity. If this assumption be correct, there would be much force in the argument, but we regard the relation between the city and the St. Louis Railroad Company as contractual, as contradistinguished from legal. If there exists between the city and this company a valid contract, then the rights and powers of the respective parties must be determined by reference to the terms of that contract, rather than the law. If there be a contract, therefore, it will be unnecessary for us to inquire into and determine the nature of the right of eminent domain, and the manner of its exercise, as well as the question as to the extent of the city's right of eminent domain.

The present charter of the city was adopted by the people of the city under a constitutional provision of the state. It must, however, be regarded simply as a legislative grant. In other words, this charter has no greater force and effect than it would have if the general assembly had enacted it, but it does have that force and effect. The city government is not an *imperium in imperio*, but, as to all matters of local concern, its authority and power are exclusive, to the extent declared

by the charter, where it does not conflict with the constitution and laws of the state. Full authority is conferred upon the city government to open and improve the streets, and control their use. Indeed, all cities have this power. The state is prohibited by section 20, article 12, of the constitution, from passing any law granting the right to construct and operate a street railroad in any city, town, village or public highway without the consent of the local authorities. But in an especial manner is the city of St. Louis clothed with plenary power by its charter in regard to the construction of railways in its streets. By section 1, of article 10, of the charter, above quoted, it has full power to determine all questions in reference to street railways. Hence, when it grants the right of way in its streets to a street-railway corporation, it does not proceed in the exercise of the power of eminent domain, but it proceeds in the exercise of its right of ownership of the streets, and it is limited in the exercise of this right to the extent only that the grant shall be for the public use and convenience.

Let us examine, now, what relation the city of St. Louis and respondent sustain to each other under the charter and ordinances of the municipal government. Respondent's original charter antedated the present charter of the city, and its franchises could not have been destroyed or made less valuable by the municipal assembly, except by virtue of the former's charter or consent. The present city charter went into operation the twenty-second day of October, 1876. On the twenty-seventh day of March, 1883, respondent obtained from the city additional franchises and rights. In order to obtain and enjoy these, it was required to agree, and it did agree, to conform to any ordinance then existing, or thereafter to be passed, enforcing article 10 of the city charter, not inconsistent with the provisions of the ordinance granting the new franchises. The petition, answer and arguments of counsel on both sides of this case proceed upon the theory that respondent was, at the

commencement of this action, and is now, enjoying its rights and franchises under the charter of St. Louis of 1876, and must conform to its requirements. So far, then, as the questions involved in this case are concerned, the respondent's charter rights must be held to have originated under the city charter of 1876, and are subject to it. By section 6 of article 10 of the charter of the city, it is provided that "any street-railroad company shall have the right to run its cars over the track of any other street-railroad company, in whole or in part, upon the payment of just compensation for the use thereof, under such rules and regulations as may be prescribed by ordinance; and it shall be the duty of the municipal assembly to immediately pass such ordinances as may be necessary to carry this provision into effect."

One thing is definitely settled by this provision, and that is, all street railroads in St. Louis are public highways. Any street-railroad company has the right to run its cars over the track of another company, and the only limitation on this right is that just compensation shall be made, and the consent of the city obtained, subject to control at all times by the city. Another proposition is settled by the record in this case, and that is, a street railroad is for a use that is public. A city has no authority to grant its streets for any use that is private. *Belcher Sugar Refining Co. v. Elevator Co.*, 82 Mo. 121. The petition in this case avers that the defendant corporation is a street-railway company, operating cars to carry passengers. Thus the respondent virtually concedes that the Southern Railroad Company is using the streets of St. Louis for a public purpose, and proposes to use respondent's track for a public purpose. *Glaessner v. Brewing Ass'n*, 100 Mo. 508; *Mikesell v. Durkee*, 34 Kan. 509. The respondent itself has no other right to the use of the streets of the city under its charter than that based on the theory that it is using them for its street railway for a public purpose. Counsel, in argument, confuse two distinct propositions. One

proposition refers to what is a public use, and the other
to public convenience and utility. A certain enterprise
may be, beyond question, for a public use, and yet there
may be no public demand for it. Whether a use is a
public one or not is for the courts to determine, and is
not a question for a jury. *City of Savannah v. Han-
cock*, 91 Mo. 57; *Kansas City v. Baird*, 98 Mo. 215.
A road, street or alley, laid out and opened by the
proper authority under the law, and dedicated to the
public, would be for a public use, though not a single
person might ever use it. The court determines whether
a contemplated use is public, but whether the public
convenience requires the use in a given case is a ques-
tion of fact which may very properly be submitted to a
jury. When the constitution, therefore, provides that,
when "an attempt is made to take private property for
a use that is alleged to be public, the question whether
the contemplated use be really public shall be a judicial
question, and, as such, judicially determined," it was
simply meant that the courts should determine whether
the use was public, as contradistinguished from private,
leaving the question of public convenience or utility to be
determined in the manner provided by law. The munici-
pality of St. Louis, being clothed with the power to
grant or withhold street-railroad franchises, must deter-
mine for itself when a contemplated street railway is
demanded by the public convenience. It cannot grant
the right to the streets for a use that is not public, but,
when the use is public, it is the sole judge as to its
utility. To prevent the granting of a franchise for pub-
lic use, which would not be of advantage to the people,
an appeal must be made to the city authorities, and to
them alone. This was expressly ruled in the cases of
*City of Savannah v. Hancock* and *City of Kansas v.
Baird*, cited above. This discretion of the municipality
is always subject, however, to review by the courts in
the exercise of equitable jurisdiction to prevent oppres-
sion and fraud; and, again, the courts must recognize

the fact that street railroads have become important and valuable institutions as means of rapid transit in our cities and town. The courts must, as a matter of law, declare a street railroad, operated solely for the carrying of passengers, a public highway, and its use a public use. Upon the record before us, we must hold that the use of the streets of St. Louis by respondent and the Southern Railway Company is a public use. The question, therefore, of the nature of the use the defendant corporation proposed to make of respondent's track is settled by the record. By agreeing, in 1883, "to conform to any ordinance now existing, or hereafter passed, enforcing article 10 of the city charter," in consideration of valuable franchises then granted to it by the city, respondent must be held to admit the right of the city to authorize the Southern Railway Company to run its cars over the track of respondent, in whole or in part, upon payment of just compensation.

The compensation to be made for the use of the track of one company by another is not fixed, nor, indeed, could it be by any general ordinance. It is simply provided that the compensation shall be "just." It is argued that the subsequent clauses of section 6, of article 10, of the city charter, did not confer power on the municipal assembly to make provision for ascertaining the compensation to be made in such cases, and that the clause, "under such rules and regulations as may be prescribed by ordinance," does not qualify the clause, "upon the payment of just compensation for the use thereof," but qualifies the first clause, that "any street-railroad company shall have the right to run its cars over the track of another street-railroad company in whole or in part." By omitting one clause, the reading would be that "any street-railroad company shall have the right to run its cars over the track of any other street-railroad company, in whole or in part, * * * under such rules and regulations as may be prescribed by ordinance," and this would conform to the view

taken by counsel for respondent. In other words, it is claimed that this section conferred power on the municipal assembly to authorize one company to use the track of another, and to control each company in the use of the track and the running of its cars, but did not authorize such assembly to prescribe any method by which the just compensation for such use could be ascertained. We do not concur in this view of the meaning of that section. It seems clear enough that the city had the right to prescribe, not only the method of running the cars of one company over the track of another, but also to prescribe a method of ascertaining the compensation that should be made for such use. But, whether this conclusion be correct or not, the concluding part of this section, taken in connection with the first section of article 10, of the charter, undoubtedly confers this power. This part is in these words: "And it shall be the duty of the municipal assembly immediately to pass such ordinances as may be necessary to carry this provision into effect." What provision? Evidently the provision in regard to the use by one company of the track of another upon payment of just compensation. If it was intended that one company desiring to use the track of another, under this section, had to resort to the proceeding provided for under the constitution and general law in regard to the appropriation of private property for public use, why make any provision at all in the charter about it? Indeed, when we go to the constitution, we find the state has subordinated its power to that of the local authority, and surrendered its right to act without consent of the municipality, nor can we find any provision in the general statutes for the condemnation of the use of a street-railway track for another company. Articles 2 and 6, of chapter 21, of the Revised Statutes of 1879, did not provide for nor contemplate any summary proceeding for any such condemnation, and when we consider

section 20, of article 12, of the constitution, and the absolute and unreserved control given the city of St. Louis by article 10 of its charter over the construction and operation of street railways, and the fact that no provision is made by general statute for any joint action of the city and state authorities in regard to any question affecting these methods of travel, either in obtaining the right of way, joint use or operation, it is manifest that the general assembly intended to leave, and did leave, the whole subject to the municipal government.

When the city authorities granted respondent, in March, 1883, additional and valuable franchises, it could have granted them on condition that the city might authorize any other company to use its track without any compensation whatever, and, if respondent had accepted the franchises on this condition, it could not be heard to complain afterwards; and, if this could have been done, *a fortiori* could the city grant the franchises on condition that respondent agree to conform to any ordinance then existing, or that might thereafter be passed, enforcing the right of one company to use the track of another, upon payment of just compensation therefor, and, when this condition was accepted, respondent became bound by its agreement. The city owned the streets, and had control of them for the public. The respondent owned certain franchises, and had certain property rights in its then lines of railroad. It appealed to the municipal assembly for an extension and enlargement of its franchises in reference to the use of the streets. The city replied that section 6, of article 10, of its charter, provided that any street-railroad company might run its cars over the track of another upon payment of just compensation for the use thereof, under such rules and regulations as might be prescribed by ordinance, and that the municipal assembly had power by ordinance to carry that provision into effect; that respondent, whose charter antedated that

of the city, was not subject to that provision ; and that these franchises would be granted on condition that respondent agree to conform to any ordinance then existing, or that might be thereafter passed, enforcing that provision of the city charter. Respondent accepted the franchises, and agreed to the conditions. The two owners met and agreed upon the relation they would sustain towards each other. This was fixed by contract, and, being thus fixed, the doctrine of eminent domain, with all that doctrine implies, is eliminated from the case. This constituted a contract binding both upon the city and respondent. *State ex rel. v. Railroad*, 85 Mo. 263, *loc. cit.* 278 and 282 ; *City v. Railroad*, 87 Mo. 151 ; s. c., 13 Mo. App. 524 ; *Railroad v. Railroad*, 32 Barb. 358 ; *Owen v. Railroad*, 83 Mo. 454 ; Elliott on Roads & Streets, 565 ; 20 N. J. Eq. 61 ; *Campbell v. Railroad*, 23 Ohio St. 168 ; *Railroad v. Palmer*, 109 U. S. 244 ; *State ex rel. v. Railroad*, 89 Mo. 523 ; *State ex rel. v. Railroad*, 99 Mo. 30.

In *Railroad v. Railroad*, 36 Ohio St. 239, the plaintiff corporation was authorized, in 1859, to construct and operate a street railway in the city of Cleveland, subject to "such restrictions as the council may hereafter pass." In 1874, the council passed an ordinance authorizing the defendant corporation to use and occupy certain streets for a street railroad, and authorizing it to use the tracks of the plaintiff "on such terms of compensation" as may be agreed upon by the parties, "and, in case of failure or inability to make such agreement within sixty days from the date of the passage of this ordinance, such terms of compensation shall be prescribed by the city council." The parties failed to agree, and the council accordingly fixed such compensation at the sum of $2,153, and in addition thereto one-third of the expense thereafter incurred in keeping the tracks in repair. The amount of compensation thus fixed was tendered by the defendant to the plaintiff, but was refused by

the latter. Plaintiff then commenced an action against defendant to restrain the latter from the use of its tracks, chiefly on the ground, as alleged, that the compensation fixed and tendered was not adequate. No proof, however, was offered as to the issue of compensation. The case went to the supreme court of Ohio, and was determined at the January term, 1880. In that case, as in the one at bar, counsel elaborately argued the questions arising out of, and incident to, the exercise of the power of eminent domain. McILVAINE, C. J., speaking for the court, after discussing some of the questions presented in regard to the power of eminent domain, concluded thus: " But, in this case, we find a stipulation to have been made, namely, that plaintiff would lay its tracks under the terms and conditions prescribed by the ordinance of September 20, 1859, or which might thereafter be prescribed by the city council; and, also, that the East Cleveland Street Railroad Company, a corporation then in existence [ not the defendant corporation, however ], should be allowed the use of the plaintiff's tracks, upon reasonable terms, to be prescribed by the council, unless agreed upon by the parties. The right of the council to prescribe terms and conditions in the future, it seems to us, was sufficiently broad to cover a future exigency like the one then existing and specially provided for; namely, an exigency arising from the necessity to provide for the public welfare, by running the cars of other street-railroad companies over the track of the plaintiff. And, this being so, the only remaining question is, was the condition as to compensation to be paid by the Broadway & Newburgh Company to the plaintiff reasonable ? In other words, was the compensation as fixed by the council fair and adequate? Upon this question issue was joined, but no testimony offered. The burden of showing its inadequacy rests upon the plaintiff. Under these circumstances, the injunction prayed for must be denied."

The Ohio court went much further in refusing relief than we have to go in the case at bar to refuse relief to respondent. In the Ohio case the council fixed the compensation to be made when the parties failed to agree. In the case at bar respondent was given an opportunity to appoint one commissioner, and to be heard before the commissioners. This was declined. In the Ohio case the plaintiff constructed its road subject to "such restrictions" as the council might thereafter pass. There the council had to provide, not only the mode of ascertaining the compensation, but also had to confer upon the defendant corporation the right to use the track of the plaintiff. Here the city charter, accepted by respondent, conferred the right upon any street-railroad company to use the track of another, upon payment of just compensation for the use thereof, under such rules and regulations as the council might prescribe by ordinance, and that the council should pass ordinances to carry out that provision.

The Ohio case is the only case cited by counsel, or that we could find, where the result reached by the court was based on a stipulation or contract.

Ordinance number 14089 authorized the defendant company to use the track of respondent on compliance with the provision of ordinance number 12652. This ordinance seems a reasonable provision to carry into effect article 10 of the charter. When the Southern Railway Company was authorized by ordinance, in 1887, to run its cars over the track of respondent's railroad, and was about to proceed to ascertain what compensation it should make to respondent for the use thereof, under ordinance number 12652, the latter instituted this suit, and the contemplated action of the mayor and the Southern Railway Company was perpetually enjoined. Respondent made no allegation, nor offered any evidence, that the use of its tracks as contemplated by the Southern Railway Company, was not a public use, nor that the compensation proposed

to be made for such use was not just, for the injunction was obtained before the compensation had been ascertained. Hence, this injunction was procured, not upon the grounds that the contemplated use was not a public use, and the compensation offered was not just, but upon the ground that the city authorities had no power to condemn the use of respondent's track for the Southern Railway Company, whether with or without the payment of just compensation therefor. The respondent has no right to come into a court of equity, and repudiate its own stipulations, and ask an injunction against the other contracting party, upon the ground that, if it had made no contract, it would have been entitled to have the question as to whether the contemplated use was a public one judicially determined by a court, and to a trial by a jury as to the compensation it should receive. By its acceptance of the ordinance of March 27, 1883, it conceded the right of any street-railroad company to the use of its track upon the payment of just compensation, and it authorized the city to prescribe the method by which such compensation should be ascertained. According to our view of respondent's stipulations, the only possible controversy that could arise between it and the city is the amount it should receive from another company for the use of its track. If the commissioners provided for would not award "just compensation," respondent had its remedy.

It is insisted that the provision made in the ordinance of January 12, 1884, for having the commissioners' award reviewed by the circuit court, is void, upon the ground that the city of St. Louis could not by an ordinance confer jurisdiction on the circuit court. Counsel for defendant replied to this position by referring to the jurisdiction conferred on the circuit court by the charter of the city, in regard to the condemnation of property for streets and alleys. As we have seen, this charter has the effect of a legislative grant, and, hence this jurisdiction was not conferred by the city, in its

municipal capacity, but by virtue of a vote of the people of the city, this vote being authorized by the whole people of the state in their constitution.   No such jurisdiction as is here claimed, and in the mode claimed, is conferred on the circuit court by the charter, when a controversy arises as to the use of the track of one company by another.   If such jurisdiction exists, it is by virtue of the constitution and of the general law, or by virtue of the ordinance named.   We are satisfied, however, beyond question, that the ordinance is valid, so far, at least, as it provides for the appointment of commissioners to fix the compensation one company should pay for the use of the track of another, where the companies interested fail to agree.   A law or ordinance may be valid in part and void in part.   *City v. Railroad*, 14 Mo. App. 221, and cases cited ; 89 Mo. 44; 1 S. W. Rep. 305; *State v. Clarke*, 54 Mo. 17.

If that part of the ordinance providing for a review of the award by the circuit court be void, for want of authority in the municipal assembly to enact it, the ordinance stands as if that provision had not been added.   In that case provision is made, *first*, for the agreement of the roads interested as to the compensation ; and, *second*, in case of failure to agree, for the appointment of three disinterested freeholders, who should ascertain and report to the mayor the compensation to be made, and the cases cited show that such an ordinance is valid.   As we have seen, there is no provision made by general statute for the condemnation of the use of a street railway for another company, and that absolute control over the construction of street railways in the city of St. Louis has been delegated by the state to the city government, and we cannot see why the provisions of the ordinance under review may not be a valid exercise of municipal power.   This ordinance does not attempt to confer jurisdiction on the circuit court over the subject-matter.   In *State ex rel. Union Depot Ry. Co. v. Railroad*, 100 Mo. 61, an application was made to

this court for a writ of prohibition to prevent the circuit court of the city of St. Louis from assuming jurisdiction to condemn the right of way over the tracks of the relator for the cars of defendant. BARCLAY, J.,. speaking for the court said : "That the circuit court of St. Louis has jurisdiction of proceedings to appropriate property to public use in the exercise of the right of eminent domain in a proper case, is unquestioned and unquestionable. But the substance of the petitioners' contention here, as well as the ground on which they, as defendants, resisted the proceedings in the circuit court, is that the statutes and ordinances do not authorize the exercise of such jurisdiction on behalf of the Southern Railway Company. * * * The circuit court, in the case in question here, had power to entertain proceedings of the general class to which that case belonged; namely, of proceedings for the condemnation of property for public use." And the court refused the writ, not on the ground that the circuit court had jurisdiction in that particular case, but because it had jurisdiction of proceedings of the general class to which that case belonged; and if the circuit court assumed jurisdiction in the particular case, when it had none, the remedy was by appeal.

If the circuit court of St. Louis, then, had no jurisdiction to condemn the track of one company for the use of another, it was not because of lack of jurisdiction of the general subject-matter, but because the property to be affected was situated in the limits of the city of St. Louis, and no mode of procedure was provided for such case. There being, however, a right, the circuit court, in a case like this, might, in the exercise of its general jurisdiction, afford a remedy, under the code of civil procedure. Now, could the city, by virtue of its charter, confer jurisdiction on the circuit court by providing a special mode of procedure in regard to a subject over which it already had general jurisdiction? Judge DILLON, in Municipal Corporations [4 Ed.] section 308,

says: "Although the proposition that the legislature of a state is alone competent to make laws is true, yet it is also settled that it is competent for the legislature to delegate to municipal corporations the power to make by-laws and ordinances, with appropriate sanctions, which, when authorized, have the force, in favor of the municipality and against persons bound thereby, of laws passed by the legislature of the state." And the cases cited in the foot-note fully sustain the general doctrine announced in the text.

In *City of St. Louis v. Boffinger*, 19 Mo. 13, it was held that, in the exercise of a power given in the charter "to make quarantine laws, * * * the government of the city must have a discretion, as wide as that possessed by the government of the state, in choosing between different measures for accomplishing the end. When an ordinance is passed under the grant of power, it is in force by the authority of the state, and is to be interpreted and executed as if it had been passed by the general assembly." In *Taylor v. City of Carondelet*, 22 Mo. 105, Judge Scott, speaking of the effect of an ordinance of a city, says· "The legislature delegated its judicial powers over the matter to the corporation, and the corporation, within the sphere of its delegated power, could act as authoritatively in relation to it as the legislature. The law-making power, in fact, made the board of trustees a miniature general assembly, and gave their ordinances on this subject the force of laws passed by the legislature of the state." The principle here announced was approved in *City of Carondelet v. Lannan*, 26 Mo. 461.

In *State v. Clark*, 54 Mo. 17, the question arose as to the power of the city to pass an ordinance to regulate bawdy-houses, in contravention of a general statute of the state prohibiting them, and NAPTON, J., speaking for a majority of the court, said: "The legislature has the right to change the common law; it has a right to allow the legislative authorities of St. Louis to

regulate the subject now under consideration differently from what it is in other portions of the state.'' And it was held that the city ordinance repealed the general law within the limits of the city; and this doctrine was again approved in *State v. Vic De Bar*, 58 Mo. 395, and again in *Givens v. Van Studdiford*, 86 Mo. 149. If we take the affirmative power given the city by article 10 of its charter in regard to the street railways, in connection with the negation of state interference by section 20, of article 12, of the constitution, we find probably a more absolute and unreserved grant of power to this municipality over the subject of the construction and regulation of street railways, in the city limits, than can be found anywhere else in this country. By this article the municipal assembly has the grant of power to determine all questions arising with reference to street railroads, whether they involve the construction of the roads, granting the right of way, or regulating or controlling them. Then comes section 6, with the powers conferred by it.

The city government undoubtedly had the authority to pass ordinance number 12652, including that part providing for a review of the award of the commissioners by the circuit court. This ordinance, having been passed in pursuance of the power conferred on it by the state, must be held to have the force of law in the city limits to the same extent as if passed by the legislature of the state. This ordinance does not attempt to confer jurisdiction of the subject-matter on the circuit court, but simply provides a special remedy for a party aggrieved, to have the award of the commissioners reviewed by the circuit court; and if, as we have shown, this ordinance has the force of a law of the state, and must be interpreted and executed as such, this remedy is provided by a law of the state, in legal contemplation. This ordinance, in regard to exceptions to the award, adopts the provisions of the general statute on the same subject substantially; and, when the circuit court gets

jurisdiction of the proceeding, the parties can demand and obtain a jury to try the question of compensation, with the right to appeal to the higher courts, as in ordinary cases. *Railroad v. Story*, 96 Mo. 611. And again, if the award of the commissioners should not be satisfactory to respondent, or should not be just, or should be obtained by fraud, it unquestionably has another remedy. If the defendant is insolvent, it can obtain an injunction in a court of equity till "just compensation" be made. This is the clear purport of the cases we have cited from Ohio, Louisiana, New York, Kentucky and New Jersey. See, also, *Keating v. Korfhage*, 88 Mo. 524. In that case the contest would not be as to whether defendant had the right to the use of the track, for that was given by the city charter, but whether "just compensation" had been made or tendered for the use of the track.

The record shows that the defendant corporation refused to agree upon the compensation payable to it, and refused to appoint a commissioner to act with commissioners to be appointed by the plaintiff corporation, and the mayor to make an award of such compensation. Upon that state of the record respondent is not entitled to equitable relief. "He who seeks equity must do equity." Bisp. Principles of Eq., p. 62, sec. 43. It conceded the right to the use of its track to any railroad company, and it could not obtain relief in a court of equity without alleging and proving that it made an effort to obtain, and failed to obtain, just compensation from the company seeking to use its track.

II. The line upon which this opinion has proceeded thus far is that respondent is bound by its acceptance of the provisions of the ordinance of March 27, 1883, and the amendatory ordinance of August 2, 1887. But we find authority for another position which bars respondent's right to the relief it seeks. It is this: Where a law confers on a corporation the right to construct and

operate street railroads in the streets of a city, such corporation must be considered as holding them for the public use, and subject to the power of the legislature, when the public exigencies require it, to authorize another corporation to use the tracks of the former upon making compensation for such use. This does not grow out of the power of eminent domain or contract. It inheres in the power to regulate and control the public streets for the public convenience. In the absence of an exclusive grant, this right is, by implication, reserved to the public. In other words, in the grant of the right to lay tracks for a street railway in the streets of a city for the public, the right to provide for the use of such track by other companies is reserved, upon making just compensation. And where the right is already in the public, the state, to exercise the right, does not proceed by virtue of the power of eminent domain. It is already the owner of the right, but it must pay for it before it can use it. When the state proceeds in the exercise of its power and right of eminent domain, it seeks to acquire the right to the use of private property. In both cases just compensation must be made, but the exercise of the power in the two cases is different.

In *Covington Ry. Co. v. Railroad*, 19 Amer. Law. Reg. 705, this very question was decided. The legislature of Kentucky authorized plaintiff to construct and operate a street railroad, and afterwards authorized defendant to construct a street railway also, and " to connect with and use the track of any other street-railway company in said city or vicinity, upon equitable terms." COFER, C. J., speaking for the court of appeals of Kentucky, says: " It is true no person can lawfully place upon a street-railway track a carriage adapted to run only on the iron rails, and use it for transporting passengers along the line, unless expressly authorized to do so. When the legislature grants to one person the right to construct a railway in a public street,

and to carry passengers for hire, the grant is necessarily exclusive, so long as similar authority is not granted to another. No person would expend money to construct a railway if all others or any other might, at pleasure, put cars upon and use it to carry passengers for hire without making compensation for the use of the track. But, although such exclusive privilege be granted, why should it continue to be exclusive? The only reason that can be given is that the grantee has expended money or assumed obligations on the faith of the grant. But did it not do so when with the knowledge implied, at least, that it held its right subordinate to the power and duty of the legislature to regulate and control the use of the streets in such manner as the public interest might in its judgment, from time to time, demand? There was no attempt by express words in the appellant's charter to give it exclusive right to run cars upon the streets occupied by its track, or even upon the track itself, and we have decided that no such exclusive right exists as to the streets. As to the track placed in the street, and thereby made a part of the public highway, and which the exigencies of the public interest might demand for the use of other companies, we think the right to its exclusive use was received and held subject to the power of the legislature to permit it to be used by such other persons and corporations as it might direct, whenever, in the judgment of the legislature, a due regard to the public right to use the streets renders it necessary to do so. This conclusion is in accord with the views of Judge REDFIELD as expressed in his report to the Massachusetts legislature upon the nature and extent of street-railway franchises (1 Redf. on Law of R. R., pp. 315, 322); and is supported by the opinion of the supreme court of New York in *Railroad v. Kerr*, 45 Barb. 138, and the supreme judicial court of Massachusetts in *Smith v. Railroad*, 6 Allen, 262."

And, to show that Chief Justice COFER did not intend this conclusion to be based on the doctrine of

eminent domain, he adds: "And, in our opinion, may be sustained upon another ground equally, if not more, satisfactory." This other ground, he goes on to show, is the right of eminent domain. Judge REDFIELD says: "A legislature may, nevertheless, allow other persons, either natural or corporate, to do a similar business in the same streets, or to do it upon the tracks of an existing company, by making compensation to another company when in their judgment the public good requires it. In the one case, the grant being wholly independent is understood to be made because the amount of the travel is supposed to require two modes of conveyance, and in the other the compensation is regarded as equivalent to the use." 1 Redf. R. R. 318.

Streets are opened and maintained for public travel and commerce. A street railway is almost universally held to be a legitimate use of the street, and its construction imposes no additional servitude upon the soil it occupies, so as to entitle proprietors abutting on the street to compensation. *Railroad v. Railroad*, 20 N. J. Eq. 61, and cases cited. Its tracks form a part of the street for the ordinary use of the public   It is required to construct its roadbed so as to obstruct public travel as little as possible. It has a license to put its rails down in secure and permanent form for the operation of its cars   The operation of its railway is the exercise of the public right of way over the street. The city has no power to grant the street, or a franchise in the street, for a private purpose ; and the city has no power, without special authority from the state, to grant an exclusive right to a street-railway company to use the street. "It is impossible to foretell what changes in the manner of using streets may be occasioned by improvements in the modes of travel, or what modifications in the use of the modes now employed may be required by the increase in population and trade, or by the shifting of the centers of business, and the routes of travel from

one part of a city to another.   The necessities and con-
venience of the public may require to-day but a single
street railway ; but circumstances may be so changed in
half a score of years as to require many lines.   From
their nature and purpose for which they are used, street
railways must be confined to streets or other public
thoroughfares, where the space that can be occupied by
them is necessarily limited.   It may be impossible to
meet the demands of the situation, unless new routes,
made necessary since the establishment of old ones, can
be extended over some portions of streets already occu-
pied by old ones ; and it may be equally impossible,
without unduly interfering with other uses of the streets,
equally necessary to public convenience and comfort,
to give such street-railway company a separate track
throughout the length of its line."   *Railroad v. Rail-
road*, 19 Amer. Law Reg. 765.

" The city council may, in the exercise of the power
delegated to the corporation in the control and regula-
tion of streets, grant to one company the right of way
over them, and afterwards grant the right of way over
a part of the same railway to another company.   The
city council is without power to grant the exclusive use
of a street which belongs to the public to a railroad com-
pany.   It cannot thus deprive succeeding councils of the
power of performing the duty of regulating the streets
as may seem to them to be for the best interest of the
public."   *Railroad v. Railroad*, 6 South. Rep. (La.)
848.   The development of rapid transit by means of
street railways has been in the last decade most wonder-
ful.   " They are now almost indispensable, and their
chief value to the many consists in their being in the
public streets, and along the shops and places of busi-
ness.   They are but a means of using the public streets
to a greater advantage for the very purposes for which
they were laid out,—free and quick transit from one
part to another.   They are the best and cheapest mode

yet devised, and they do not hinder the use of the street for public travel." 20 N. J. Eq. 61.

The companies constructing these ways, however, have valuable property rights in them not held by the general public. They have the right of way on the tracks. They have a property right in the material of which the road is constructed. " Such material in place is as strictly private property of the corporation as it was before it was placed, save in this only, that, having been placed in a public street, it was thereby dedicated to the ordinary use of the public ; but as a railroad such material remains the private property of the company, and for such purpose it is subject to the use and control of the owner exclusively." *Railroad v. Railroad*, 36 Ohio St. 239. These companies also have a property right in the franchises granted, which ought to be, and is protected against spoliation.

Every principle of justice and equity, as well as the dictates of common honesty, demand and require that the state, or the municipalities acting under state authority, should protect the franchise and property rights of street-railway companies. While this is true, however, the public has rights also which ought to be scrupulously guarded and maintained. As facilities for rapid transit increase, and as the cost of transportation decreases, travel increases, and as travel increases the demand for more routes of travel increases. Companies, having invested their means in these lines, ought to receive fair compensation for their outlay and work, and yet the state ought to see that the means of fair competition are maintained. If there is one tendency of our times more marked than another, it is the tendency to monopoly and concentration of corporate power. This tendency had become so marked in 1875 and 1876 that the people of the state in their constitution, and the people of St. Louis in their charter, provided the most stringent measures to restrict and control

it. The constitution declares all railroads public high-
ways, and the charter of the city of St. Louis provides
for the joint use of the street railway tracks in the city
limits by the different street railway companies. And it
is the duty of the courts to construe these provisions so
that, while affording ample protection to capital against
arbitrary state or municipal spoliation, the rights of the
public will be upheld, by limiting, at least, the monop-
olistic tendency, and guaranteeing fair competition
between public carriers.

If the present routes of travel from Market street to
Wash avenue, along Fifth and Sixth streets, in the city
of St. Louis, are not sufficient to afford accommodation
to all who have occasion to use them, then it is the man-
ifest duty of the municipality of the city to authorize
those having the will and the means to provide facilities
to supply the additional demand. As the situation now
is the defendant corporation is unable to compete with
the other street railways along Fifth and Sixth streets,
between Market street and Wash avenue, for the travel
on those streets. It is to the interest of those who
desire to go from the southern limits of the city to a
point north of Market street, or from a point north of
Market street to a point south of it, to be able to do so on
a street car by the payment of one fare only, and with-
out change of cars; and it is to the interest of the pres-
ent street railways along the streets named, north of
Market street, to prevent the extension of the line of the
defendant so as to come in competition with them.
This conflict of interest is direct and sharply defined.
And, to meet just such a contingency, section 6, of arti-
cle 10, of the city charter, gave the joint use of the street-
railway tracks to the street-railway companies of the
city, and made the municipal assembly the com-
mon arbiter between them as to the method of the use
and the remedy for just compensation. The interests
of the public and private capital are both preserved.
The interests of the companies must yield to reasonable

provisions against monopoly, and in favor of fair competition, and the interests of the public must yield so far as to provide just compensation to private capital for the use of that which is for their convenience, comfort and material prosperity. There is no spoliation in this. The people get the use, and the companies, compensation for the use.

In conclusion, we will restate what we hold to be the settled principles of law as applicable to and governing this case: *First.* That streets cannot be occupied for private business, and the right to construct and operate street railways in them can be granted only upon the ground that they are for the public use, and in furtherance of public convenience; and, as a corollary to this proposition, the public has the reserved right to grant the use of street-railway tracks to companies other than those constructing them, upon making just compensation. *Second.* The city charter of St. Louis is a grant by the people of the state, and has the force and effect of a legislative grant to the municipal government within the city limits. *Third.* By the charter the city of St. Louis has unreserved and exclusive control of the construction and operation of street railways in its streets, including the power to grant or withhold the right of way therein. *Fourth.* Any street-railway company has the right to run its cars over the track of another in that city, upon the payment of just compensation for the use thereof, under such rules and regulations as the municipal assembly may by ordinance prescribe, and the municipal assembly has the power to pass ordinances to enforce this right. This is not a reserved, but an affirmative, right for the public benefit, binding as well upon the city government as upon the companies. *Fifth.* By the acceptance by respondent of ordinance number 12477, and the amendatory ordinance of August 2, 1887, it made its right to operate its street railways subject to the city charter adopted in

1876, and hence conceded the right of the other railways of the city to use its tracks under section 6, of article 10, of that charter. *Sixth.* Ordinance number 12652 was, and is, a valid exercise of the power of the municipal assembly of the city under article 10 of the charter, and respondent became subject and amenable to its provisions, by its acceptance of the ordinances above named. *Seventh.* If the award provided for under ordinance number 12652 should be unjust, or made or obtained by fraud, the party aggrieved could be relieved against it by adopting the special method provided for in the ordinance, or by application to the courts in the exercise of their general jurisdiction. *Eighth.* The defendant corporation having a right to the use of respondent's tracks under the charter and ordinances of the city, the respondent is not entitled to an injunction to restrain it from exercising that right, without alleging and proving such facts as clothe the courts with power to grant relief in the exercise of their equitable jurisdiction, and, respondent having failed to make any such allegations or proof, the injunction herein granted ought to be dissolved.